Decided at PENDLETON, July 31, 1897.

### STATE *v.* PORTER.

[49 Pac. 964.]

CRIMINAL LAW — CONFESSIONS.— Statements or declarations of the accused, voluntarily made, of such facts as necessarily involve the commission of a crime, or in themselves constitute a crime, are admissions of guilt, and may be properly demominated "confessions"; nor will they be reduced to the grade of admissions only by exculpatory statements made in the same connection: *State* v. *Heidenreich,* 29 Or. 381, distinguished.

EVIDENCE — IDENTIFICATION OF EXHIBITS.— Clothing alleged to have been worn by a deceased person at the time he was killed is sufficiently identified at the trial of the slayer when it is shown that deceased was buried in the clothing he wore when killed, and that it was subsequently removed when the body was exhumed by the coroner for the purpose of examination, and thereafter disposed of under the direction of the coroner and other officers.

CLOTHING AS EVIDENCE.— The clothing worn by two deceased persons at the time they were killed may be offered in evidence in a trial for the murder of a third person who was killed with them at the same time by the defendant, for the purpose of showing the direc-

tion of the gunshot wounds upon their persons, and thereby fix the direction from which the accused fired when such third person was shot.

THREATS AS EVIDENCE.— Threats made against the accused by one who was not present at a homicide, and who is not shown to have been acting in concert with the deceased, cannot be proved to show that the defendant acted in self-defense.

RIGHT OF DEFENDANT TO TESTIFY.— An instruction to the jury in a criminal case, that the defendant is "permitted" to be a witness in his own behalf, does not express an idea antagonistic to the absolute right which the statute guarantees him in this respect, and is not erroneous.

INSTRUCTION ON SELF-DEFENSE.— An instruction by the court upon the plea of self-defense, that the danger must have been "absolute, imminent, and unavoidable," is not erroneous when coupled with other instructions that the defendant might also have acted upon appearances, if they were such, under the circumstances and surroundings, as to reasonably imbue his mind with the belief that it was necessary to act as he did to avert the impending assault upon him, whether actual or apparent.

GOOD CHARACTER— REASONABLE DOUBT.—A request by a defendant in a criminal cause to charge "that proof of good character may be sufficient of itself to create a reasonable doubt of guilt, although no such doubt would have existed but for such good character," although correct as an abstract proposition of law, is properly refused, since the form is vicious unless confined to a given case.

VALUE OF EVIDENCE OF GOOD CHARACTER.— Evidence of good character is always admissible in favor of the defendant in a criminal action, and should be weighed and considered in connection with all the other evidence in the cause in determining the guilt or innocence of the accused; and, when so considered, if there exists in the mind of the jury a reasonable doubt as to his guilt, he should be acquitted.

IDEM.—The court instructed the jury: "Defendant has a right to show his previous good character as a circumstance tending to show the improbability of his guilt. If, however, you believe from the evidence, beyond a reasonable doubt, that the defendant committed the crime in question as charged in the indictment, then it would be your duty to find the defendant guilty, even though the evidence satisfied your mind that defendant, previous to the commission of the alleged crime, had sustained a good reputation as a peaceable and law-abiding citizen." This instruction does not limit or confine the consideration of reputation to the case where the jury are still in doubt after the consideration of all other testimony, but is a fair statement of the law in this state on the sub-

ject of good character as a defense: *State* v. *Garrand*, 5 Or. 216, applied.

HARMLESS ERROR.—A defendant in a criminal case cannot complain of an erroneous instruction which is in strict accord with his line of defense.

From Union: ROBERT EAKIN, Judge.

Kelsey Porter was convicted of murder in the first degree and appeals.

AFFIRMED.

For appellant there was a brief and an oral argument by *Messrs. C. E. Cochran, J. M. Carroll,* and *Chas. F. Hyde.*

For the State there was a brief over the names of *Cicero M. Idleman,* attorney-general, and *Hugh E. Courtney,* district attorney, with an oral argument by *Mr. John L. Rand,* former district attorney, *Mr. Thos. H. Crawford,* and *Mr. Courtney.*

MR. JUSTICE WOLVERTON delivered the opinion.

The defendant was convicted of having committed the crime of murder in the first degree by killing one Joseph Benjamin Mache, whose wife and son, named respectively Mary E. Mache and Benjamin Mache, Jr., he also killed at the same time. The bodies of the latter had each a gunshot wound thereon of a nature to produce death almost instantly, and upon the body of Joseph Benjamin Mache there were found three gunshot wounds and a fracture of the skull, as to which latter there is some uncertainty touching the cause that produced

it. Either one of two of the wounds upon the body, or the one upon the head, was sufficient to produce death. One of the questions most strenuously urged here involves the instructions of the court respecting certain statements of the defendant tending to connect him with the commission of the crime with which he was charged. The objection goes to the use made by the court of the term "confession" in connection with such statements. To be clearly understood, it is necessary to recite some of the testimony relating thereto. Henry Oliver testified, in substance: That on January 1, 1896, the day of the homicide, he and his brother, Charles Oliver, met Mr. Baker and the defendant about six miles from the defendant's place where the homicide occurred. That Baker said to the witness: "I guess you had better go down to Mr. Porter's place. Porter has done up the Mache family. You and Charlie had better go down there"; and that the witness asked defendant for some directions, to which he replied, "You will find them at the barn." Continuing, the witness further stated: "I went down to Porter's place. I found the sleigh down at the creek. Found Mrs. Mache sitting in the sleigh, with her shoulders turned a little to the right, she being dead. I found Mr. Mache at the right-hand corner of the sleigh, in the creek. He was dead, lying in the water. I found Ben Mache, Jr., next. He was about forty or fifty yards up the slope from the other bodies, where he fell. The imprint looked as if he had fallen upon his back. I found a gun [revolver] by Ben Jr., with

the muzzle down in the snow. After examination, I found three empty shells occupying three chambers of the gun, and one empty chamber and two cartridges in the chambers." On redirect examination the following was elicited: "Q. Did Mr. Porter tell you anything at any time how old man Mache was—what he was doing at the time he shot him? A. Yes. He talked on the road coming down here about the case, and at one time said he shot the old man Mache. Q. What did he say at that time to you about how Mr. Mache was at the time he killed him? A. He said he saw the old man Mache was shot, and he started there towards the sleigh. I believe he said he started to run down to the sleigh—towards them—and the old man jumped out of the sleigh, and run towards him, and he shot him." H. J. Baker testified, in substance, that he saw the defendant on the morning of the first, before 9 o'clock. He came to witness' place on horseback; was much excited; had a gun with three cartridges and one empty shell in it. Witness then responded to interrogatories as follows: "Q. You may state to the jury what he said. A. He said he had ruined the Mache family. Q. What else, if anything, did he say then? Go ahead and tell the conversation that occurred at that time—all the conversation you had with him. A. He said he had killed young Ben Mache, and I said, 'Did you kill the old man?' and he said, 'I did.' I said, 'For God's sake, you didn't kill the old lady, Mrs. Mache?' He said, 'I killed her too.' And I asked why he did that, and he said he got so scared, as

soon as he saw them, that when Ben shot at him he shot at Ben, and killed the old woman; and I asked him why he killed the old man, and he said he saw Ben running down the road, and he shot at him and hit the old man. Q. What else did he say? A. After he started for town, he said he was in a hurry to get a doctor. He thought she was only hurt. She was sitting up in the sleigh. I asked why he didn't go and see, and he said he was in a hurry to get the doctor." On cross-examination witness stated that the accused said he fired the shots from the shed, and gave as a reason why he did not give up the gun to witness at once that "he was afraid of being shot by this man Rockwood." Charles Oliver testified as follows: "Q. You may state to the jury what, if anything, he said about the homicide. A. He said so much that I can't remember all of it. He made one remark that after he got down off the barn, and the sleigh had stopped down there at the creek, he went down there to see what was the matter with them, or something to that effect. While there, the old man started at him with his hands up, and he says, 'If you want it, I'll give it to you,' and shot him right there." The defendant being called as a witness in his own behalf, testified, in substance: "I think it was on Wednesday when the trouble occurred. That morning, after feeding the stock, I went down and shoveled the snow off my barn. It was just a little bit after I had been at the barn for the purpose of shoveling snow before the Maches came along. Prior to this time we had had some difficulty with

reference to some harness which Ben Mache, Jr., and William Rockwood stole from me. When I got back from looking after the harness one day, Mr. Mache and his wife came down through my place. They stopped right close to my stable, and the old man disputed my word, called me a liar, and I told him that I wanted him to keep off my place, and not bother me any more. The Maches and Rockwood would go through there most every day and this man Rockwood was implicated with these other parties, and was what caused me to get the gun in the first place on account of his being there, this Rockwood—for Bob Haynes was telling me about what Rockwood said, that he and Ben Mache was going to set me afoot, and put a bullet hole in me. When I got home, Rockwood came along, and he slipped his hand back on his pistol, and threatened to shoot me. He said, 'God dam you, I have been hunting for you; and I will fix you with my Winchester if you don't run.' That morning of the trouble I climbed upon the stable with my gun. I understood that Rockwood was going to take a gun that morning to raffle it off, and I was afraid of him. I laid my gun upon the ribs beside the rafters. I had not been there very long—perhaps a minute or two—when they came. I saw them down below, and they came through, and I picked up my gun, and went out on the west shed—this shed that is near where they came along. The road passes close to it, and I stood on the shed with my gun in my hand, down by my sides. The old man drove up, and we commenced talking. I said, 'You

o

please quit coming through here. You throw my fence down, and let the stock out.' Says he, 'You lie; you lie,' and swore again, and says, 'This is a public highway through here, and you needn't try to keep us out. We will kill you if you do.' Just then I seen something glitter off to my left side, and I turned to look that way, and I saw it was a pistol right there, and Ben Mache was pointing it right at me, and as I looked around the pistol went off with a bang, and I raised my gun to shoot at the boy, and he struck out on his horse, and run down a little to left as he started. He was in a hurry to get away, and was grabbing at the reins. I think the pistol is what caused the horse to shy; and as the horse ran down the road, running from side—from one side of the road to the other—I was shooting at the boy, and when the old folks got killed he ran right in line with them, so that in shooting at him I hit the old folks. I made no demonstration of any kind with my gun up to the time Ben Mache shot at me. I was just holding it in my hand. I had no intention of killing the old man and his wife, and they would not have been killed if Ben had not fired those two shots at me first."

Other evidence shows that the body of Ben Mache, Jr. was found 310 feet distant from the shed, and the bodies of Joseph Benjamin and his wife 420 feet from the same point, and that the shooting was done with a Winchester rifle. Three exploded shells were found at the shed, and two within six or eight feet of the sleigh. The court

instructed the jury as follows: "Evidence of oral
confessions, admissions, or statements of defendant
are admissible against him on the trial of a crimi-
nal action; but if you believe from the circum-
stances proven that the defendant may not have
clearly expressed his own meaning, or witness mis-
understood, such confessions or admissions should
be viewed with great caution. In this case, if you
believe from the testimony and the circumstances
that the confessions or admissions were correctly
and understandingly made by the defendant, and
that his language is correctly remembered and ac-
curately given by the witness, then such confes-
sions or admissions are entitled to weight the
same as other testimony. The confessions or ad-
missions of a defendant may be given against him
on a trial for crime, but such confession is not
sufficient alone to warrant conviction without some
other proof that the crime has been committed;
that is, that the body of the offense — that is, the
fact of the killing — must be proven by other evi-
dence."

It is contended that the jury might have been
misled by the court's use of the term "confession,"
that it was erroneously employed as synonymous
with the word "admission," and that under the
testimony it was inapplicable and misleading, and
hence there was no warrant of law for its employ-
ment in the instruction. It has been decided by
this court that the word "confession" is not a syn-
onym of "admission": *State* v. *Heidenreich,* 29 Or.
381 ( 45 Pac. 755). Mr. Greenleaf has indicated

the distinction in general use. He says: "In our law, the term 'admission' is usually applied to civil transactions, and to those matters of fact in criminal cases which do not involve criminal intent; the term 'confession' being generally restricted to acknowledgments of guilt": 1 Greenleaf on Evidence, § 170. Later on, in speaking of "confessions," he says: "Extrajudicial confessions are those which are made by the party elsewhere than before a magistrate or in court; this term embracing not only explicit and express confessions of crime, but all those admissions of the accused from which guilt may be implied": Id., § 216. Mr. Stephens has defined "confession" as "an admission, made at any time by a person charged with a crime, stating or suggesting the inference that he committed that crime." See Stephen's Digest of Evidence, 52. Underhill adopts the same definition: Underhill on Evidence, § 88. The learned authors of the Am. & Eng. Enc. of Law (1st ed. vol. III, p. 439) define it as "a person's admission or declaration of his agency or participation in a crime, and is restricted to acknowledgments of guilt." Mr. Wharton has given us a more elaborate discussion of the subject. He says: "Extrajudicial confessions * * * may be adduced either as admissions of guilt or as admissions of isolated facts from which guilt may be inferred. When offered for the former purpose, they have no weight unless they were made intentionally and in sincerity. * * * To the credibility of a confession of guilt, therefore, it is necessary that there should be an *ani-*

*mus confitendi*, or intention to speak the truth as to the specific charge of guilt. Such intention, however, is not essential to attach credibility to admissions of particular facts in themselves indifferent, but which go to make up a case on which guilt is assumed to rest. * * * A confession of guilt is of no weight unless it is a shorthand admission of facts. An admission of an incidental fact is of no weight unless it afford a basis for an induction of guilt. The first is inoperative unless, as an answer to a particular offense charged, it implies a specification which is sufficiently exact to sustain a conviction. The second is inoperative unless it is supported collaterally by a series of other facts from which guilt may be cumulatively inferred. The first is, 'I am guilty of this,' and this implies an admission of all the acts constituting guilt. The second is, 'Such an act, part of a complicated web of circumstances, is true'; and this involves the examination of all other relevant circumstances": Wharton on Criminal Evidence, §§ 626, 628.

From these authorities we take it that the admission of a fact, or of a bundle of facts, from which guilt is directly deducible, or which within and of themselves import guilt, may be denominated a confession, but not so with the admission of a particular act or acts or circumstances which may or may not involve guilt, and which is dependent for such result upon other facts or circumstances to be established. Of the latter character were the admissions in the Heidenreich case. The defendant

admitted that he was, or had been, in possession of cattle alleged to have been stolen; but the admission was made in connection with a statement of exculpating circumstances explaining his possession, which were entirely consistent with his innocence. His guilt was not deducible from his admissions without the presence of other facts and circumstances necessary to be proven in connection with his possession to establish the crime charged, and hence it was held that the court erred in characterizing such admissions as confessions. Very similar in nature is the case of *People* v. *Velarde*, 59 Cal. 457, as is also *Fletcher* v. *State*, 90 Ga. 468 (17 S. E. 100). Another case is *State* v. *Red*, 53 Iowa 69 (4 N. W. 831). The defendant was tried on a charge of murder. His admissions to the effect that he had in his possession jewelry of the murdered woman were put in evidence, and the court characterized them as confessions, and this was held to be error. The appellate court said: "The fact of the possession of the goods raised a powerful presumption of his guilt of the murder. But his admission of such possession was in no sense a confession of guilt": *Dumas* v. *State*, 63 Ga. 600, comes nearer the border line. It was shown that defendant had admitted that he was present when the deceased was shot, but protested his innocence of any participation in the crime, and it was held to be error for the court, in its instructions, to refer to the admissions as "confessions of guilt": See also, *Covington* v. *State*, 79 Ga. 687 (7 S. E. 153), and *Fletcher* v. *State*, 90 Ga. 469 (17 S. E. 100). In each of these

cases, and others we might cite, the facts admitted
may have been taken as entirely true, and still be
consistent with perfect innocence. In other words,
they fall short of constituting the crime charged,
and while the admissions may have furnished strong
proofs against the accused, yet they were fragmen-
tary, and, unless complemented by other proofs nec-
essary to the establishment of the offense, guilt
could not be predicated upon the admissions. The
inference of guilt may have been strong, but guilt
itself could not be a concomitant, or a resultant con-
dition proceeding from the acts admitted. But the
facts admitted in the case at bar are of a different
character. The defendant admitted to Baker that
he had killed the old man Mache, and, when asked
why he did it, he said he was scared because Ben, Jr.,
had shot at him, and as he saw Ben running down
the road he shot at him, and killed the old man
Again he stated to Charles Oliver that after he
got down off the barn, and the sleigh had stopped
at the creek, he went down to see what was the
matter with them, and while there the old man
started at him with his hands up, and that he shot
him right there. Henry Oliver testifies that, "He
[defendant] said he saw the old man Mache was
shot, and he started there towards the sleigh. I be-
lieve, he said he started to run down to the sleigh,
towards them, and the old man jumped out of the
sleigh, and run towards him, and he shot him."
Here are direct admissions of the killing of Joseph
Benjamin Mache by the accused, and, indeed, this
much was conceded at the trial. But the admissions

go further. They concede that the killing was purposely done. This is apparent from the statments made to the two Olivers. His statements to Baker, however, embraced the narration of acts designed to present an excuse for the killing which are, in effect, that while defending himself against an assault of Ben Mache, Jr., he, by accident, killed the old man. The admissions are somewhat contradictory, but were designed to be exculpatory, no doubt, rather than inculpatory. A killing purposely and maliciously done, without deliberation or premeditation, is murder in the second degree. Malice may be implied from a killing purposly done without extenuating circumstances to palliate the offense, and the admission of such a fact under the conditions named would, in effect, be an admission of guilt, as it is the necessary resultant condition proceeding from the acts admitted. Again, his statement that he shot at the boy while he was scared, and acting in self-defense, and killed the old man, when taken in connection with other circumstances of which there was evidence, viz., that the boy was killed more than a hundred yards from the point where the accused was standing, suggests a state of facts from which the inference of guilt involving the crime of manslaughter might have been drawn. But beyond all this his statements while on the witness stand contain admissions of fact which import deliberation and premeditation involving the crime of murder in the first degree. So that there is substance in his admissions which import guilt touching all the degrees of murder.

The instructions, however, were given with reference to admissions before the trial, and it is in that light that we design to consider them, and it is sufficient that the admissions involve any degree of the crime charged. The court very carefully instructed the jury touching the different degrees of murder; and a confession of either degree, with proof of the *corpus delicti*, would be sufficient upon which to base a verdict of the crime involved. A homicide may be either justifiable or excusable, but these are defenses which the accused must interpose. And if his admissions involve either degree of murder, unless justification or excuse is shown, he must stand convicted of the degree involved. And the question of the greatest difficulty seems to arise where the admissions are both inculpatory and exculpatory; that is to say, where the acts admitted involve a crime, but a justification or excuse is offered in the same connection. The reasoning of counsel seems to be that, because of the exculpatory matter, there can be no concession of guilt, and hence that the statements or admissions cannot amount to a confession. But the concessions of facts which import guilt come first. These are always inculpatory, and it is only when the exculpatory matter is adduced that he is relieved from the onus of guilt which the facts imply. It is not necessary that there be a declaration of an intent to admit guilt; it is sufficient that the facts admitted involve a crime, and these import guilt, or, as put by Mr. Wharton, " 'I am guilty of this;' and this imports the admission of all the acts con-

stituting guilt": Wharton on Criminal Evidence,
§ 628. It is necessary, however, that the accused
should speak with an *animus confitendi,* or an in-
tention to speak the truth touching the specific
charge of guilt; and when he, with such intention,
narrates facts constituting a crime, the guilt be-
comes matter of inference, a resultant feature of
the narration without an explicit declaration to
that effect. So that we conclude that whenever
the statements or declarations of the accused, vol-
untarily made, are of such facts as involve neces-
sarily the commission of a crime, or in themselves
constitute a crime, then the facts admitted im-
port guilt, and such admissions may properly be
denominated confessions. Exculpatory statements,
made in the same connection, if believed, may
excuse or justify, but do not reduce the declara-
tion from a confession to an admission only. This
is in accord with the idea expressed in the books
that confessions must be taken as a whole, and, if
one part of a conversation is relied upon as proof
of a confession of a crime, the prisoner has a right
to lay before the court the whole of what was said
in that conversation; and he is not confined to so
much only as is explanatory of the part proved
against him by the state, but is permitted to give
evidence of all that was said upon the occasion
relative to the subject matter in issue: 1 Greenleaf
on Evidence, § 218. We think that what was said
by the accused prior to the trial to the witnesses
Baker and the two Olivers might properly be de-
nominated confessions, and hence that the use by

the court of the term "confession" or "confessions" in its instructions was not error. In any event, it is clear that the jury was not misled by its use in the light of the very full, lucid, and self-explanatory instructions of the learned trial judge when taken as a whole.

Upon the trial, certain clothing of Ben Mache, Jr., and Mrs. Mache was offered in evidence by the prosecution for the purpose of locating and determining the direction of gunshot wounds upon their persons, to which objection was interposed upon the grounds—first, that it was not identified; and, second, that it was incompetent to introduce the clothing of the son and wife on a charge of killing Joseph Benjamin Mache. The bodies were all shown to have been buried in the clothing worn at the time of homicide, except that the overcoat of Benjamin Mache, Jr., was removed, and this garment was not offered. Some twenty-two days after the burial, the bodies were exhumed for the purpose of examination by the coroner, and it was then that the clothing was removed, under the direction of that officer. Thenceforward it was disposed of under the direction of himself and other officers, and when produced at the trial was identified as that removed from the exhumed bodies. Under these circumstances the objection was properly overruled, tested by the first ground therefor. Nor is the objection tenable upon the other ground. The killing of the three persons took place in close proximity with one another, and constituted a series of events of but one and the same transac-

tion, and the killing of the son and wife was an essential circumstance surrounding the event which resulted in the death of the old man. Indeed, a consecutive and intelligent narrative of events beginning with the first assault and ending with the last homicide could not be made without recounting the incidents, circumstances, and conditions attending the death of both the son and wife. They were concomitant events, and the one could not be told without involving the other, and a segregation would leave the narrative incomplete. So that the circumstances and conditions attending the death of any one or more of these individuals constitute part of the *res gestæ* attending the death of any other, and, this being so, it was proper, as being part of the *res gestæ*, to admit the clothing of Benjamin Mache, Jr., and Mrs. Mary E. Mache to be offered for the purpose of locating and determining the direction of the gunshot wounds upon their persons, and thereby fix, if possible, the direction from which the accused was firing when the old gentleman was wounded or killed.

The defendant called as a witness in his behalf William Hansaker, who testified, in substance: That he went to the Mache place, and stayed all night with Rockwood; that Mr. Mache, the old gentleman, had been to the valley that day, and told him that he had a few words with Porter; that he was talking to him about losing a cow or heifer; that he had asked Porter if he had found her yet, and, Porter having answered in the negative, that Mache said to him, "I guess you damn lie; you never lose

no cow"; and that Porter ordered him off the place, and that Rockwood said he would go through there (meaning Porter's place) whenever he pleased, and the old man said he would tear the fence down, and go through there, and the courts could not stop him; that Ben Mache, Jr., came in, and asked the witness to go with him to Porter's, and have a "touch of high life"; all were present, including Rockwood, when Ben asked witness to go up to Porter's; that the witness never saw Rockwood after that prior to the homicide. He was then asked, "Did you have any conversation with him (Rockwood) in relation to Porter?" which, upon objection, the court would not permit to be answered. The counsel thereupon stated that if witness had been permitted to answer he would have said "that two days prior to the homicide, said Mr. Rockwood, in speaking of the defendant, Porter, stated that he was on Porter's place two days before the homicide was committed, on horseback, armed with a six-shooter, and that he got off from his horse, and run Porter in his own dwelling-house." Thomas Ludiker testified, in substance, that he had a conversation with Ben Mache, Jr., in December some time, and that Ben said that Porter had forbid his father and Rockwood from going on the place, and made his threats that he was going to forbid him from going on. Then follows a statement of some threats of Ben against Porter. The witness further testified that Ben said Porter had accused him and Rockwood of taking his harness, and that he had called Porter down for it, and abused him, and that

he and Rockwood had hauled up their (meaning the Mache's) winter's wood. By further interrogatories, which were overruled, it was proposed to show that on the morning of the killing Rockwood was on the premises armed with a 44 Winchester rifle; that he made some threats, and the nature thereof; and that he was acting in concert with the Maches. The defense also proposed to show by Robert Haynes that Rockwood said to him on the twenty-ninth of December that Porter had accused him and Ben Mache of stealing harness, and that they would just like to meet the ———— out there, and that, if they could meet him, he would beat his damn brains out with a six-shooter, and that this was communicated by Haynes to Porter. The purpose of this testimony, introduced and offered as claimed by counsel, was to put the jury in the place of the accused, so far as possible, so that they might determine whether he acted under a reasonable apprehension 'of an assault from the Maches, or, in other words, whether his acts were influenced by Rockwood's conduct in connection with the acts of Ben Mache and the old gentleman. The rule has become settled in this state that, "in order to justify a homicide on the ground that it was committed in self-defense it must appear that the defendant, at the time he caused the death of the deceased, was acting under a reasonable belief that he was in imminent danger of death or great bodily harm from the deceased, and that it was necessary for him to strike the fatal blow, or to perform such other act causing the death of de-

ceased, in order to avoid the death or great bodily
harm which was apparently imminent": *State v.
Morey*, 25 Or. 250 (35 Pac. 655, and 36 Pac. 575).
See, also, in support of this doctrine, Kerr on
Homicide, § 166. Previous threats of the deceased
against the accused, or previous unfriendly acts
toward him, are permitted to be shown for the pur-
pose of esbtablishing a reasonable ground for belief
or apprehension by the accused that he was in dan-
ger of death or great bodily harm at the time of
the homicide. From such testimony the jury are
to become the judges whether, under the circum-
stances, there was ground for a reasonable belief in
the mind of the accused that he was then in such
danger. Now, from the defendant's statement as a
witness in his own behalf it appears that he saw
the deceased, with his wife, riding in a sleigh, pass
through the bars some little distance from the barn,
and that Ben Mache, Jr., came through at the same
time on horseback, and that no other person was
with them; that they came directly along the road
from the bars to the barn; that in the meantime
he took up his rifle, and stepped around on the shed
adjoining the barn, and the altercation took place
as they came by, and that Ben Mache, Jr., shot first.
These conditions, if true, were calculated to arouse
in the mind of the accused a reasonable apprehen_
sion of danger to his person, and the prior threats
of Ben Mache, Jr., were pertinent to the inquiry, as
they might have had some influence in superinduc-
ing such apprehension. But it is clear that Rock-
wood's acts and threats, whatever they may have

been, unconnected with the Maches, could not have superinduced apprehension upon this occasion, as it was admitted that he was not present, and could not have taken any part in the assault. There was an offer in general terms to prove that Rockwood was acting in concert with the Maches, but how, it was not made apparent; all the threats and acts of the Maches, and all those of Rockwood, where connected with them, having gone to the jury. If he had been present and participating in the fray, the conditions would have been different. In that case his prior acts and threats might reasonably have been said to have had some bearing upon his participation at the time, and to have superinduced apprehension in the mind of the accused, and caused him to act as he did upon the occasion. There is simply no relevancy between the prior threats and acts of Rockwood sought to be introduced and the acts of the accused at the time of the homicide, and hence it was not error to exclude the testimony.

The instructions of the court touching the question were fully as favorable to the defendant as he could ask. Among other things, the court instructed the jury as follows: "Under the statute of this state, a defendant in a criminal action is permitted to be a witness in his own behalf, and the jury are to be the exclusive judges of the weight and credibility to be given his testimony." Exceptions were taken to the use of the word "permitted," the defendant having the absolute right to testify in his own behalf. No question is made but that such was his

right, and the term "permitted" was not used to express an idea antagonistic thereto, but rather to express the statutory right that was guaranteed to him; and no doubt the jury so understood it, and hence the instruction was not erroneous.

Again, the court instructed the jury, touching the law of self-defense, that the danger "must. be absolute, imminent, and unavoidable, or the defendant must, from all the circumstances, have honestly believed it to be so"; and it is claimed that it was error for the court to tell the jury that the danger "must be absolute, imminent, and unavoidable." This expression was, however, coupled, and very properly so, with the alternative expression above quoted, which, with other language used in the same connection, intelligently informed the jury that the defendant might also have acted upon appearances if they were such, under the circumstances and surroundings, as to reasonably imbue his mind with the belief or apprehension that it was necessary to act as he did in order to avert the impending assault upon him, whether actual or apparent. The explanation was full, and the jury could not have been misled by the language complained of, and error cannot be predicated upon said instruction.

Touching upon the effect of good character as a fact proven in the case, the court instructed the jury as follows: "The defendant in this case has offered evidence tending to show his character as a peaceable, law-abiding citizen. The defendant has a right to show his previous good character as a circumstance tending to show the improbability of

his guilt, or that he would commit such a crime.
If, however, you believe from the evidence, beyond
a reasonable doubt, that the defendant committed
the crime in question as charged in the indictment,
then it would be your duty to find the defendant
guilty, even though the evidence satisfied your
minds that defendant, previous to the commission
of the alleged crime, had sustained a good reputa-
tion as a peaceable and law-abiding citizen." The
defendant requested the following instruction, which
was refused, viz.: "The court further instructs you
that proof of good character may be sufficient of
itself to create a reasonable doubt of defendant's
guilt, although no such doubt would have existed
but for such good character." The gravamen of
defendant's objection to the instructions given is
that the court virtually withdrew from the jury
the evidence of good character except for the pur-
pose of resolving a doubt which the other testi-
mony in the case may have left in the minds of
the jury touching the guilt or innocence of the ac-
cused; and that such instruction, without that asked
and refused, was faulty, and prejudicial to him.
As an abstract proposition of law, the instruction
requested is no doubt correct, but the form is vic-
ious unless confined to a given case. Under certain
circumstances and conditions, such may be, and un-
doubtedly is, the effect of good character proven,
but as a general rule applied to all cases it can-
not be so treated. The rule of general application
is that evidence of good character is always admis-
sible in favor of the defendant in a criminal ac-

tion, and it should be weighed and considered in connection with all the other evidence in the cause in determining the guilt or innocence of the accused; and, when so considered, if there exists in the minds of the jury a reasonable doubt as to his guilt, he should be acquitted (*Commonwealth* v. *Cleary* [Pa. Sup.] 19 Atl. 1017 [8 L. R. A. 302]; *Edgington* v· *United States*, 17 Sup. Ct. 72; *State* v. *Henry*, 5 Jones [N. C.] 65; *People* v. *Ashe*, 44 Cal. 288; *People* v. *Raina*, 45 Cal. 292; *State* v. *Donovan*, 61 Iowa 278 [16 N. W. 130]; *State* v. *McMurphy*, 52 Mo. 251; *Jupitz* v. *People*, 34 Ill. 516); and this rule was practically adopted in *State* v. *Garrand*, 5 Or. 216. Under the rule, good character of the prisoner, when proven, becomes a fact in the case, a circumstance tending in a greater or less degree to establish his innocence; and it is not to be put aside by the jury in order to first determine whether the case is of doubtful sequence before laying into the scales such fact or circumstance. It may, when thus considered with other evidence in the case, leave the mind of the jury impressed with a reasonable doubt, or it may be sufficient within itself to engender such a doubt while without it the other evidence may be convincing, and its value is matter for the determination of the jury under all the existing circumstances and conditions surrounding each particular case. See *People* v. *Ashe*, *Edgington* v. *United States*, and *State* v. *Donovan*, *supra*. The instruction given, when properly understood, is not subversive of the rule. The court first tells the jury that good character is a circumstance tending to show the im-

probability of the defendant's guilt of the crime charged. Such being a part of the evidence in the case, the court further says: "If, however, you believe from the evidence beyond a reasonable doubt that the defendant committed the crime in question," then that it would be their duty to convict even though they believed his good character had been proven. The latter clause of the instruction does not eliminate from their consideration the fact or circumstance of good character. As a simple declaration, the jury were told that the good character of the defendant should not stand in the way of conviction if the evidence in the case showed him to be guilty beyond a reasonable doubt. Touching the latter clause of the instruction, the case of *State* v. *Henry,* 5 Jones (N. C.) 65, is much in point. BATTLE, J., speaking for the court, says: "Such a remark, properly understood, does not withdraw the consideration of character from the jury. It presupposes that the testimony of character has been duly weighed by them, and it can legitimately operate only as a caution to the jury. Thus the testimony is not of itself to preponderate over all the other facts and circumstances given in evidence, and thus produce an acquittal, merely because the party charged had previously borne a good character." In *State* v. *McMurphy,* 52 Mo. 251, the court says: "In all cases, whether the evidence of guilt is circumstantial or positive, the good character of the accused is proper evidence to go to the jury on the plea of not guilty. If, however, the jury is satisfied of the prisoner's guilt from all the other facts

and circumstances detailed in the evidence, his good character cannot be looked to as a ground of acquittal." This language is even stronger than that in which the instruction is formulated, and the court was not in error in adopting the course pursued.

Another objection is made and exception saved to the court's instruction to the effect that the homicide of the three Maches was all one transaction. If it be conceded that the instruction was wrong, as a matter of law, under the facts as they really existed, it could not have injured the defendant, as he based his defense upon the theory that Ben Mache, Jr., assaulted him first, and that in resisting the assault the old gentleman was killed unitentionally, his death resulting from a continuous transaction commencing with the assault of the young man upon the accused. So that the instruction was in strict accord with his line of defense, and of this he cannot complain. These considerations affirm the judgment of the court below.

AFFIRMED.

Decided January 17, 1898; rehearing denied.