STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOSEPH BROWN, DEFENDANT-APPELLANT.

Argued October 13, 1965—Decided December 6, 1965.

*Mr. John L. Moore* argued the cause for defendant-appellant (*Mr. John C. Howell*, of counsel and on the brief).

*Mr. Philip R. Glucksman*, Assistant Prosecutor of Essex County, argued the cause for respondent (*Mr. Brendan T. Byrne, Prosecutor of Essex County*, attorney).

The opinion of the court was delivered by

FRANCIS, J. Defendant Joseph Brown was convicted of murder in the second degree for the fatal stabbing of one James Fields in the City of Newark on December 14, 1963. He was sentenced to 18 to 25 years in New Jersey State Prison. Thereafter he appealed directly to this Court claiming that prejudicial error had occurred at his trial. *R. R.* 1:2–1(c).

The circumstances surrounding the homicide are not difficult to relate. They appear largely in defendant's police statement and his trial testimony.

According to Brown, he arose on December 14, 1963 at about 5:00 A.M., after four or five hours sleep. His intention was to go to work. While walking to his place of employment he stopped to talk with a friend and drank some wine with him. James Fields, another friend, came along with a companion and they joined in the conversation. Fields and his companion had two pints of wine which the four then consumed. At about 8:00 A.M. Fields invited Brown to come to his room and do some further drinking. It was raining at the time and Brown did not feel like working, so he accepted the invitation. The two men stopped at a liquor store, purchased

a bottle of sherry wine and went to Fields' room. The room was a small one, about 12 by 16 feet, and contained a double bed, a dresser and two chairs. The only means of ingress and egress was a single door which opened into the hallway. The next room off the hallway was a kitchen used in common by occupants of the building.

Fields and Brown drank together in the room for an unstated period of time. On two occasions while they were so engaged Fields left the room and went to the kitchen. On his return from the second trip, he suddenly punched Brown in the head in the area of his right eye and temple. Brown was sitting in a chair at the time and there was no explanation for the attack. He asked Fields if he was "crazy," whereupon Fields said he was "going to beat hell out of" him. Then he punched Brown again driving him backward into the dresser. At this time Brown, who said Fields was coming at him "like he was crazy," saw a knife, apparently a kitchen knife, on the dresser. Its size was not fixed definitely, although he said the blade was three inches long or better. As Fields attempted or struck a third blow with his fist, Brown picked up the knife and stabbed him in the abdomen with it. According to Brown, Fields then moved aside and he walked out of the room. On reaching the street he threw the knife into a garbage pail in front of the house. It was never located.

About five hours after the stabbing, two police officers who had been summoned to the area found Fields sitting on the sidewalk and leaning against the building. They thought he was intoxicated, but he told them he had been stabbed. They took him to St. Barnabas' Hospital where he underwent immediate surgery. This was unsuccessful and he died three days later. The fatal stab wound in the abdomen was five and one-half inches deep. The autopsy revealed another superficial cutting wound on the lower back. Defendant's version of the fracas provided no explanation for the back wound.

After leaving Fields' place Brown went to his niece's home where he stayed that night. Thereafter, he said, he lived and worked around Newark for the next two months. On Febru-

ary 18, 1964 he turned himself in to the police. He told the officer at the police headquarters that he wanted to give himself up. Among other things, he said he had been drinking with Fields and had "stuck him."

Shortly thereafter defendant gave the police a written statement the substance of which is detailed above. The statement was admitted in evidence without objection. No question as to its voluntariness was raised either at the trial or on this appeal. In fact, in his brief defendant "freely concedes that the statement was made voluntarily * * *." The State also produced a friend of defendant's with whom he had discussed the fight. According to this person Brown told him, "We were scuffling and we went down and he was on top of me and I stuck him to get him off of me."

The trial judge charged the jury at length on the degrees of murder and on manslaughter, as well as defendant's claim of self-defense. The appeal concerns itself primarily with criticism of the charge, of the weight of the evidence as to second degree murder, and the sentence imposed upon Brown following his conviction of second degree murder.

I.

In attacking the charge, defendant says it suggested that a person "might kill in self-defense only if an actual necessity therefore existed." Certain excerpts from the charge are quoted in support of the claim. The quotations, considered in isolation, might give pause to a reviewing court. But instructions to a jury cannot be dealt with in that way. They must be examined in their entire context and a decision reached whether in the light of all that was said on the particular subject the charge was erroneous or misleading or prejudicially ambiguous. *State v. Hipplewith,* 33 *N. J.* 300, 317 (1960).

In portions of the charge other than those referred to by defendant, the court instructed the jury that "self-defense is the right to defend oneself against any force or seriously

threatened force actually pending or *reasonably apprehended* by the defendant." (Emphasis supplied) He also discussed the law relating to the duty of an attacked person to retreat and the nature of the force which such a person could use for self-protection. He told the jury that only such resistance could be used as was reasonable under the circumstances, "and, of course, what appeared to have been necessary for self-protection," and that "only such force may be used and no more than would be reasonably necessary for self-defense." He instructed further that in determining whether necessity existed for defendant to use force in self-defense, or whether the force used by defendant was the product of a reasonable apprehension of the need therefor, or whether defendant should have retreated (as he had described that obligation), they should "consider the situation of the accused at the time and under the circumstances then and there confronting him."

 This Court in *State v. Hipplewith, supra,* and *State v. Abbott,* 36 N. J. 63 (1961), spelled out succinctly for our State the guiding principles to be used in instructing the jury on self-defense. In *Hipplewith,* Justice Proctor said for a unanimous Court:

"A person may kill in self-defense when the act of killing is necessary or reasonably appears to be necessary in order to preserve his own life or to protect himself from serious bodily harm. * * * The right of self-defense does not depend upon a showing of socalled 'actual' necessity. It is sufficient that defendant show he reasonably believed it necessary to kill. * * * Whether the act of killing was necessary or reasonably appeared to be necessary is to be determined by the jury, not the defendant, in light of the circumstances existing at the time of the homicide." 33 N. J., at pp. 316–317.

And see *State v. Abbott, supra* (36 N. J., at pp. 68–72). Whatever may be the view elsewhere, the two cases cited have settled the law for New Jersey. See *Model Penal Code,* § 3.04(2)(b) (Proposed Official Draft, 1962); *Perkins, Criminal Law* (1957), pp. 884–886.

Study of the trial court's charge as a whole against a backdrop of *Hipplewith* and *Abbott* warrants the conclusion that

the jury was not erroneously advised as to the tests to be applied in passing upon the claim of self-defense.

 Defendant argues also that the trial judge should have charged the jury in accordance with his request and in considering the claim of self-defense apprehension of grave bodily harm by defendant would invoke the defense "just as effectively as apprehension of danger to life." As we have noted above, the judge told the jury defendant had the right to defend himself "against any force or seriously threatened force"; also that a defendant could defend himself when "he, in good faith, believed, even though mistakenly, that he was in danger of bodily harm to himself." These statements, in the light of the charge in its entirety, presented the issue of defendant's right to use force in his defense with sufficient adherence to the applicable rule as to be free from prejudicial error. It is a commonplace doctrine of appellate review that a trial court need not employ the precise language of a request to charge in explaining the law of the case to the jury. *State v. Dunphy,* 24 *N. J.* 10, 17 (1957).

## II.

Defendant alleges the trial court committed prejudicial error in the charge in referring to his statement to the police as a "confession." In connection with defendant's statement, the court said:

"With respect to the *written confession of the defendant* in this particular case, you will recall it was marked in evidence, I think it was S-4, but you will have an opportunity to read it. This *statement is in the nature* of a confession * * *." (Emphasis added)

Then the jury was told if found by them to have been made voluntarily, the "statement" could be considered in the same manner as any other evidence in the case. And the court said "In doing so, you must consider the credibility and the facts involved in the *statement or confession, as it is sometimes called."* (Emphasis added)

It appears that in the course of the charge the writing was spoken of once as the "written confession," once as "this statement is in the nature of a confession," once as the "statement or confession, as it is sometimes called," and five times simply as "the statement."

Defendant says that while in his statement he freely admitted responsibility for the death of Fields, it should not have been referred to as a confession. Taken as a whole he insists it shows he is not guilty of any crime, because on the facts set forth therein he was entitled lawfully to stab Fields in self-defense.

We need not discuss the technical distinction between confession and admission. Compare *State v. Donato,* 106 *N. J. L.* 397, 405 (*E. & A.* 1930), with *State v. Callaghan,* 81 *N. J. Super.* 518, 523–524 (*App. Div.* 1963). In this case the matter is largely one of semantics and the distinction, to all intents and purposes, without a substantial difference.

In the statement Brown admitted striking Fields in the abdomen with a knife—a lethal weapon—as a defensive measure against a man, not substantially different in age or weight, who had struck him twice with his fists—generally regarded as non-lethal weapons (*State v. Van Duyne,* 43 *N. J.* 369, 377 (1964)), and who was attempting to strike him again with his fists. Obviously, even if the statement were considered alone, it could not be said that self-defense was established as a matter of law. Strictly speaking the writing contained inculpatory facts as well as some which could be regarded by a jury as tending toward exculpation, depending on all the other facts and circumstances developed on trial of the case.

Regardless of what the writing was called, it was given to the jury to consider along with all other evidence in the case, under a lucid charge by the court as to the use that could be made of it. Neither its effect nor its contents were magnified or overemphasized in any way. The contents were not complicated nor at all difficult to understand in relation to the entire proof in the case. We cannot see how the jury could

have been misled to the defendant's prejudice simply because the court used the various terms mentioned above to describe the document. *Cf. State v. Porter,* 32 *Or.* 135, 49 *P.* 964, 968 (1897). Examination of the court's charge shows plainly that the jury knew it was to acquit defendant if exculpatory facts, whether proved at the trial or contained in the statement, raised a reasonable doubt as to his guilt of murder or manslaughter.

### III.

Defendant contends it was error for the trial court to charge the jury that if they found defendant had committed an unlawful homicide (which he had previously defined) the law presumed such killing to be murder in the second degree. More specifically, he says that where, as here, at the close of the case proof has been introduced which would justify a jury in finding either second degree murder or manslaughter, the court should not refer to the legal doctrine that upon proof of an unlawful killing a presumption arises that it was murder in the second degree. His thesis is that an instruction as to the presumption in such cases is confusing to a jury and tends to impose a burden of persuasion on a defendant which collides with the pervasive and nevershifting duty of the State to prove guilt of one or the other of the two degrees of murder or manslaughter beyond a reasonable doubt. We cannot agree.

It has long been the law of this State, and the uniform practice to advise the jury, that when a defendant is charged with murder and the proof offered by the State shows an unlawful killing, the crime is presumed to be murder in the second degree. See the comprehensive opinion of Justice Haneman in *State v. King,* 37 *N. J.* 285, 293 (1962); also *State v. DiPaolo,* 34 *N. J.* 279, 294, *certiorari* denied 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed.* 2d 80 (1961); *State v. Williams,* 29 *N. J.* 27, 44 (1959), *Brown v. State,* 62 *N. J. L.* 666, 699–700, 704 (*E. & A.* 1898), affirmed 175 *U. S.* 172,

20 *S. Ct.* 77, 44 *L. Ed.* 119 (1899). Undoubtedly the princi-
ple arose in the interpretation and administration of the mur-
der section of the Crimes Act. *N. J. S.* 2A:113–2 (which
traces back to the 1847 Crimes Act Revision, Rev. 1847, § 4,
*pp.* 256, 258). It provides:

"Murder which is perpetrated by means of poison, or by lying in
wait, or by any other kind of willful, deliberate and premeditated
killing, or which is committed in perpetrating or attempting to perpe-
trate arson, burglary, kidnapping, rape, robbery or sodomy, is murder
in the first degree. *Any other kind of murder is murder in the second
degree.* \* \* \*" (Emphasis added)

The italicized sentence makes plain that in a trial for murder,
as soon as the State shows an unlawful killing and even before
an effort is made to bring it within any one of the categories
of first degree murder specified in the preceding sentence of
the section, such killing by legislative declaration is second
degree murder. In applying this statute in the trial of an
indictment for murder, over the years the courts have spoken
of this declaration as creating a presumption that such kill-
ing is second degree murder. Then if the prosecution claims
the crime is first degree murder, the jury is told that the
State has the burden of adducing evidence (except in common
law felony murder cases) demonstrating beyond a reasonable
doubt that the elements of premeditation, deliberation and
willful execution of the design to kill were present at the time
of the killing. And if on all the proof in the case, whether
offered by the State or defendant, a finding of manslaughter
would be justified, the jury is instructed further as to the
crime of manslaughter, and the issue of guilt of that offense
is submitted for determination. Thus long-standing prece-
dent negatives the suggestion that error was committed by
referring to the presumption of second degree murder. *State
v. Huff*, 14 *N. J.* 240, 253 (1954). In fact the practice of
describing an unlawful killing as presumptively second degree
murder, clearly is more favorable to a defendant than if the
offense were spoken of in the precise language of the statute.

Defendant further criticizes the court's charge because it did not say, as he requested, that if the jury had reasonable doubt "as to whether defendant is guilty of manslaughter or murder, the doubt must be resolved in the defendant's favor."

We find no error in that respect. As has been indicated above, even assuming a request to charge correctly states an applicable legal principal, if the court's charge, viewed in its entire context, adequately covers the matter, there is no basis for complaint.

Here the trial judge carefully and at length explained to the jury that the State had the burden—which never shifted—of proving the guilt of the defendant beyond a reasonable doubt; he properly defined reasonable doubt. He defined first and second degree murder and manslaughter fully and clearly, and explained the essential differences between the two degrees of murder and manslaughter. Specific instruction was given that the defendant was presumed to be innocent and his guilt "of the crime charged and of each element thereof" must be shown beyond a reasonable doubt. And he said that if the jury was satisfied upon all the evidence that defendant's guilt had been proven beyond a reasonable doubt, the verdict "must be guilty of the crime or degree of crime so proven." The jury, having been informed about the effect of reasonable doubt in language broad enough to relate to every issue in the case, there was no duty on the part of the court to reiterate it and apply it specifically in the terms requested by defendant. A court cannot be burdened with the virtually impossible task of casting the same basic idea in every possible lingual form the ingenuity of counsel can design. *Warner v. State,* 56 *N. J. L.* 686, 688 (*E. & A.* 1894). Moreover, there is nothing in either of the cases relied upon by defendant, *State v. Scott,* 104 *N. J. L.* 544, 547 (*E. & A.* 1928) (where denial of the very request to charge involved in this case was sustained) or *Brown v. State, supra* (where language slightly different from the request presented by Brown was used by the trial court while discussing reason-

able doubt in the course of his charge to the jury), which would support the allegation of error here.

## IV.

Defendant argues also that the verdict of second degree murder was against the weight of the evidence, and that the evidence at most would support only a verdict of manslaughter.

The record does not sustain either of these claims. Ample evidence was adduced at the trial upon which a finding of guilt of second degree murder could be made. As Justice Proctor said for the Court in *State v. Williams*, 39 *N. J.* 471, 490 (1963), since problems of credibility, evaluation of the evidence, and responsibility for determining an accused's guilt have been intrusted to the jury, a reviewing court may not upset its verdict on the grounds advanced by defendant unless an obvious failure of the jury to perform its function is shown.

## V.

Defendant's final point is that the record of the case shows the sentence of 18 to 25 years in State Prison is excessive. Under the statute the maximum permissible imprisonment for second degree murder is 30 years. *N. J. S.* 2A:113-4. Ordinarily an appellate court will not review a sentence which is within the limits prescribed by the statute. *State v. Mull*, 30 *N. J.* 231, 239 (1959). Imposition of sentence has wisely been placed in the hands of trial judges. Their discretion in that regard will not be interfered with unless the term imposed clearly is unduly punitive. No such conclusion can be drawn here. The trial court saw the defendant and heard his explanation of the killing. He became aware of Brown's previous conviction for atrocious assault and battery. In the face of all the circumstances of the case, it cannot be said reasonably that the imprisonment meted out constitutes an abuse of discretion.

## VI.

For all the reasons detailed above, we find no error in the record which would justify a reversal of defendant's conviction. It is therefore affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.