624 A.2d 53

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. C.H., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted November 18, 1992—Decided April 27, 1993.

114

Before Judges KING, LANDAU and THOMAS.

*Zulima V. Farber,* Public Defender, attorney for appellant (*Vito Sciancalepore,* designated counsel, of counsel and on the brief).

*Robert J. Del Tufo,* Attorney General, attorney for respondent (*James E. Jones, Jr.,* Deputy Attorney General, of counsel and on the letter brief).

The opinion of the court was delivered by

THOMAS, J.A.D.

Defendant appeals from convictions of second degree sexual assault, contrary to *N.J.S.A.* 2C:14–2b (count one); endangering the welfare of a child, a crime of the third degree, contrary to *N.J.S.A.* 2C:24–4 (count two); two counts of first degree aggravated sexual assault, contrary to *N.J.S.A.* 2C:14–2a(1) (counts three and four); second degree aggravated sexual assault, contrary to *N.J.S.A.* 2C:14–2b (count five); and endangering the welfare of a child, a crime of the third degree, contrary to *N.J.S.A.* 2C:24–2 (count six).

At sentencing, the trial judge first merged count one with count two and count five with count six. The court then imposed a five year custodial term as to count one, a fifteen year custodial term as to count three, a fifteen year custodial term as to count four and a five year term as to count five. All terms are to run concurrently. Defendant was also assessed a $120 Violent Crimes Compensation Board penalty.

## FACTS

This case involves a young girl (A.P.) who told numerous witnesses about how she was sexually abused. The acts complained of focused on April 23, 1988, while A.P. was visiting overnight at the home of her aunt. It was then that defendant, the aunt's live-in boyfriend, came into her bedroom, placed his penis on her face and attempted to insert it into her mouth. Unable to enter her mouth, defendant held A.P.'s nose in order to force her mouth open. A.P. opened her mouth, but defendant still was unable to insert his penis. Defendant ejaculated on her face allowing some of his semen to enter A.P.'s mouth. Defendant also placed his tongue in A.P.'s vagina and digitally penetrated her.

Defendant's sexual activity stopped when he heard a noise which caused him to leave the room.

The following day, A.P., who was age eight at the time, told family members about the incident. After discussing the matter among themselves for several days, the family members met with a Division of Youth and Family Services social worker, Deborah Maasi. When the social worker interviewed A.P. privately, A.P. told Ms. Maasi that she was sleeping at her aunt's home when defendant entered the room and attempted to "put his privacy in her mouth." She further told the caseworker that when she resisted, defendant held her nose in order to open her mouth. A.P. recounted that defendant "peed in her face" and "touched her privates with his fingers" but stated nothing to indicate that digital penetration had occurred. A.P. also related that a similar incident had occurred previously. Ms. Maasi stated that A.P. had not told her parents the entire story because she was ashamed and embarrassed. Ms. Maasi referred the family to Dr. Julie Ashton, a resident in pediatrics who examined A.P. on May 2, 1988.

Dr. Ashton testified that A.P., without prompting, recounted that her aunt's boyfriend went to the bathroom on her face, describing the substance as white in color. A.P. also stated that defendant used his fingers and mouth in her genital area and that he attempted to insert his penis into her mouth. Dr. Ashton further recounted that A.P. told her defendant had done this on three occasions in the bedroom of her aunt's home. The doctor indicated that examination of A.P. revealed no physical signs of sexual abuse, but that this was not inconsistent with the story A.P. had unfolded.

Dr. Susan Cohen–Esquilian, a psychologist at the United Medical Center in Newark also examined A.P. According to Dr. Cohen–Esquilian's testimony, A.P. told her that her aunt's boyfriend had entered her bedroom and touched her "privacy" with his hand and mouth and attempted to place his penis in her mouth. She relayed that she turned away but that he peed on her face.

She also told the doctor that this happened on numerous occasions, but defendant had warned her not to tell anyone about the incident.

On May 3, 1988, Detective Bonita Johnson took a statement from A.P. The detective testified that A.P. recounted how her aunt's boyfriend "tried to put his privacy in her mouth and he peed in her face and felt her vagina, her privacy with his tongue and his hand."

Based upon an evidentiary hearing held pursuant to *Evid.R.* 63(33), the trial judge determined that these witnesses were qualified to give this testimony about what A.P. had told them.

By the time this case reached trial, A.P. was eleven years old. She gave the following testimony on direct examination:

Prosecutor: Now, I want you to tell the jury as best you can on that night what happened when you slept over there[ ].

A. He put his—tried to put his privacy in my mouth.

Q. Who did?

A. [C.H.]

Q. And when you say, privacy, could you tell us what you mean by that?

A. Yes. His penis.

Q. Did you know that it was his penis three years ago when you were eight?

A. Yes.

Q. And did you know where that was?

A. Yes.

Q. Can you point where it was?

A. In the front.

Q. And you said he tried to put it in your mouth?

A. Yes.

Q. How did he try to do that?

A. He just laid it there.

Q. I'm sorry.

A. He laid it there.

Q. Laid it where?

A. On my mouth.

Q. What did you do when he did that?

A. I turned around.

Q. How did you turn around?

A. On the other side of the bed.

Q. What did he do when you turned around?

A. Huh?

Q. What did you do when you turned around, what did he do?

A. He turned me over.

Q. Then what did he do?

A. He held my nose. He held my nose.

Q. And what did he do when he held your nose?

A. He tried to get me to open my mouth so I couldn't breathe.

Q. What did you do when he did that?

A. Well, my mouth opened. I turned back around.

Q. What happened when your mouth opened?

A. Nothing.

Q. Did he get inside your mouth?

A. No.

Q. Did he touch you outside your mouth?

A. Yes.

Q. And when it touched the outside of your mouth, what did it feel like?

A. I don't know.

Q. Did it taste like anything—is that a yes or no?

A. Yes.

Q. What did you taste?

A. Sperm.

Q. How do you know it was sperm?

A. Because it wasn't pee.

Q. How did you know it wasn't pee?

A. Because pee is watery.

Q. What was this?

A. Slimy.

Q. At the time this happened did you think it was pee?

A. Yes.

Q. And why did you think that?

A. Because I didn't know what it was.

Q. When is it that you started thinking it was something other than pee?

A. When I found—

Q. Sorry?

A. When I learned what it was.

Q. Was this after this happened?

A. Yes.

Q. When you say that you tasted this, do you know where it came from?

A. Yes.

Q. Where?

A. His privacy.

Q. Could you tell if it was a lot or a little that came out?

A. A lot.

Q. Where did it go?
A. On my face.
Q. And what happened after it came out?
A. Nothing.
Q. Did he do anything else?
A. He wiped it off with my housecoat.
. . . .
Q. Now, when you said he tried to feel your privacy with his hand, could you tell us exactly what he did?
A. He moved the shorts over to the side.
Q. Moved the shorts over to the side. Then what did he do?
A. Then he tried to feel it.
Q. Tried to feel? Did he use his hand or fingers?
A. His fingers.
Q. What did he do with his fingers?
A. He moved it around.
Q. And where did he move it around?
A. In my privacy.
Q. Did he put it in a lot or a little?
A. A little.
Q. Just a little. Do you know how long he did that for?
A. No.
Q. And you said that he used his mouth on your privacy?
A. Yes.
Q. Could you tell us how he did that?
A. With his tongue.
Q. His tongue.

She explained her new found explanation of sperm versus pee on cross-examination:

MR. SCIANCALEPORE: When did you learn that what comes out of a man's privacy is called sperm?
A. Cause pee don't make babies.
Q. When did you learn about that?
A. In school.
Q. In school.

And on re-direct:

Q. What did you learn in school?
A. What sperm was, to make babies from.
Q. Did you learn where sperm came out of?
A. Yes.
Q. Now, did you learn this in school after this happened to you or before?
A. After.

Q. But before that you didn't know?

A. No.

A.P.'s aunt testified that on the night of the incident, she fell asleep on the couch while she and defendant were watching a movie. She slept through the night and did not wake until the following morning.

Defendant denied having any sexual contact with A.P., contending that on the night of April 23, 1988, he was downstairs watching television with his girlfriend. Defendant further alleged that his girlfriend fell asleep on the couch about one-half hour before he fell asleep on the chair next to her.

Defendant appeals raising the following issues:

*POINT I*

THE TRIAL COURT ERRED IN ALLOWING TESTIMONY UNDER EVIDENCE RULE 63(33).

*POINT II*

THE TRIAL COURT ERRED IN NOT GRANTING DEFENDANT'S MOTION TO DISMISS COUNTS ONE AND TWO OF THE INDICTMENT.

*POINT III*

DEFENDANT'S PRECLUSION FROM CROSS EXAMINING DEBORAH MAASI REGARDING WHETHER SHE SPOKE TO H.P. REGARDING PRIOR INCIDENTS OF SEXUAL ABUSE DENIED DEFENDANT A FAIR TRIAL.

*POINT IV*

THE TRIAL COURT ERRED IN FAILING TO DISMISS COUNTS THREE AND COUNT FOUR OF THE INDICTMENT FOR LACK OF EVIDENCE.

*POINT V*

THE TRIAL COURT IMPROPERLY ALLOWED EXPERT TESTIMONY WHICH WENT TO THE ULTIMATE ISSUES IN THE CASE.

*POINT VI*

THE IMPROPER COMMENTS ON SUMMATION CONSTITUTED PROSECUTORIAL MISCONDUCT AND DENIED DEFENDANT A FAIR TRIAL.

*POINT VII*

THE TRIAL COURT FAILED TO PROPERLY INSTRUCT THE JURY AS TO THE DEFINITION OF AGGRAVATED SEXUAL ASSAULT AND THE USE OF OPINION EVIDENCE.

*POINT VIII*

THE SENTENCE GIVEN APPELLANT WAS MANIFESTLY EXCESSIVE.

## POINT I

 Defendant asserts that the trial court erred in allowing into evidence hearsay statements made by the victim. Specifically, defendant alleges that the testimony of Deborah Maasi, Dr. Cohen–Esquilian, Dr. Ashton, H.P. (A.P.'s stepfather), E.P. (A.P.'s mother), and Detective Bonita Johnson should not have been admitted, notwithstanding *Evid.R.* 63(33). This rule provides that:

> A statement by a child under the age of 12 relating to a sexual offense under the Code of Criminal Justice committed on, with, or against that child is admissible in a criminal proceeding brought against a defendant for the commission of such offense if (a) the proponent of the statement makes known to the adverse party his intention to offer the statement and the particulars of the statement at such time as to provide him with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 8(1), that on the basis of the time, content, and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse; provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of paragraph (b) of Rule 17.

Thus, *Evid.R.* 63(33) permits the admission of hearsay statements made by child abuse victims provided the trial court first finds that the safeguarding features of the rule have been met. To accomplish this, the court must conduct an evidentiary hearing to determine if the out-of-court statements possess "sufficient indicia of reliability" in order to be admitted at trial. *State v. D.R.*, 109 *N.J.* 348, 363, 537 *A.2d* 667 (1988).

*Evid.R.* 63(33) was proposed by the Supreme Court in *State v. D.R., supra,* 109 *N.J.* at 359–60, 537 *A.2d* 667:

> [A] child victim's spontaneous out-of-court account of an act of sexual abuse may be highly credible because of its content and the surrounding circumstances. Young children, having no sexual orientation, do not necessarily regard a sexual encounter as shocking or unpleasant, and frequently relate such incidents to a parent or relative in a matter-of-fact manner. *See* Note, [*A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases,* 83 *Colum.L.Rev.* 1745 (1983)]; Note, [*The Testimony of Child Victims in Sex Abuse Prosecutions: Two Legislative Innovations,* 98 *Harv.L.Rev.* 806, 817 n. 80 (1985).] Several commentators have observed that child victim accounts of incidents of sexual abuse are highly reliable. *See, e.g.,* [Skolar, *New Hearsay Exceptions for a Child's Statement of Sexual Abuse,* 18 *J. Marshall L.Rev.* 1, 44–45 (1984) ] ("The overwhelming opinion

of mental health workers, social welfare workers, and police investigators is that children almost never make false [sexual abuse] reports.") *Accord [National Legal Resource Center for Child Advocacy and Protection, Young Lawyer's Division, American Bar Association Recommendations for Improving Legal Intervention in Child Abuse Cases*, J. Bulkley ed. (1982) at 35] (courts treat children's statements of abuse "as very trustworthy").

The United States Supreme Court recently listed several factors relating to the reliability of a child victim's hearsay statements. *Idaho v. Wright*, 497 *U.S.* 805, 110 *S.Ct.* 3139, 111 *L.Ed.*2d 638 (1990). The following factors were identified: "spontaneity and consistent repetition ... mental state of the declarant ... use of terminology of a child of similar age ... [and] lack of motive to fabricate." *Idaho v. Wright, supra*, 497 *U.S.* at 821–22, 110 *S.Ct.* at 3150, 111 *L.Ed.*2d at 656.

The trial court in the instant action held three days of pretrial hearings in order to determine if the out-of-court statements made by the child victim would be admissible pursuant to *Evid.R.* 63(33). Following the hearing, the trial judge, in a thirteen page decision, reviewed the testimony of the six witnesses now contested by defendant. She concluded that each could testify as to the hearsay statements given them by A.P. We have carefully reviewed the record of the *Evid.R.* 8 hearing and conclude it fully supports the findings and conclusions of the trial judge.

All of the indicia of reliability are apparent in the pretrial testimony of the proffered six witnesses. There is no reason to disturb the trial court's ruling as to the admissibility of A.P.'s hearsay statements.

## POINT II

Defendant next asserts that the court erred in not dismissing counts one and two of the indictment for failure to afford defendant proper notice of the complaints against him. Defendant contends the indictment, alleging that the incidents occurred between on or about the 13th day of September 1987 and on or about the 23rd day of April 1988, failed to give defendant proper notice. The court, however, determined that defendant was af-

forded adequate time to prepare and respond since the allegations were sufficiently specific to place defendant on notice. The court also noted that pretrial conferences had already transpired giving defendant adequate time to prepare his defense.

While it is well established that an indictment must contain a written statement of essential facts which constitute the offense, *State v. Browne*, 86 *N.J.Super.* 217, 206 *A.*2d 591 (App.Div.1965), a young victim will not have to be as exacting when specifying dates of abuse. *In the Interest of K.A.W.*, 104 *N.J.* 112, 515 *A.*2d 1217 (1986). The Court in *K.A.W.* held that a juvenile complaint is not required to specify an exact date of abuse since strict application of that rule would inhibit prosecution of child molesters. *Id.* at 119, 515 *A.*2d 1217. This relaxation does not negate the requirement that defendant receive adequate notice of the incident to allow proper preparation of a defense. *Id.* at 122, 515 *A.*2d 1217. In *K.A.W.*, the Court concluded that fixed standards cannot be utilized to decide if a particular defendant has been given proper notice. In so doing, it set forth several guidelines for notice questions, namely the, " 'length of the alleged period of time in relation to the number of individual criminal acts alleged; the passage of time between the alleged period for the crime and defendant's arrest; the duration between the date of the indictment and the alleged offense; and the ability of the victim or complaining witness to particularize the date and time of the alleged transaction or the offense.' " *Ibid.* (Citation omitted). The Court included as additional factors; the age and intelligence of the victim, the State's attempt to narrow the time period, and whether there was evidence of a continuing course of abusive conduct. *Ibid.*

In the case at bar, defendant was afforded adequate notice to enable him to prepare his case. The victim described the time and place of the April incident with precision. With regard to the September date, the victim testified that a similar incident had transpired in the past. Defense asserts that no attempt was made to narrow the time gap between the two events. Relevant to this

issue is the following colloquy between the victim and counsel which occurred before the grand jury on September 30, 1988:

Q. Did this ever happen before?
A. Yes.
Q. Were you still eight or—were you still eight when this happened?
A. Yes.
Q. Do you know when it happened?
A. No.
Q. You don't know the date?
A. No.
Q. But it was before the day that you told your father?
A. Yes.
. . . .
Q. And were you eight years old?
A. Yes.

This exchange evidences the State's effort to narrow the time period and the date specified reflected the victim's sharpest memory of the events. It should be noted defendant was indicted in October of 1988 and trial did not begin until February 1991 allowing defendant more than an adequate time period within which to prepare his defense. Thus, defendant's argument that the trial court's failure to dismiss counts one and two based on inadequate notice and time to prepare his case is meritless.

## POINT III

■ Defendant next asserts that the trial judge erred in not allowing defense counsel to question Deborah Maasi about a conversation she had with H.P. concerning defendant's alleged prior sexual encounters with A.P. The State counters that the testimony was properly limited since the proposed testimony constituted hearsay.

The following series of questions and answers between defense counsel and Deborah Maasi occurred:

Q. And when you spoke to [H.P.] over the phone he told you a brief outline of the allegations involving her; didn't he?
A. Yes.
[Prosecutor]: Objection, hearsay.
The Court: She answered. The objection is overruled. Go Ahead.

[Prosecutor]: Your Honor, I understand that she answered, but the content would be hearsay if she asks—

. . . .

Q. And he told you that there was—

[Prosecutor]: Objection—

A. Previous incidents involving—

[Prosecutor]: Objection. That's completely hearsay.

[Defense counsel]: It's a prior inconsistent statement, your Honor. He denied he did.

The Court: It is not a prior inconsistent statement. The objection is sustained.

Q. Were you aware of the fact that at the time of that interview that there was— had been previous incidents between [C.H.] and [A.P.]?

A. Yes, I did find out. I did find that out.

Q. At the time of the phone call with [H.P.], were you aware—

[Prosecutor]: Objection, your Honor.

The Court: Your objection is sustained. Don't go into it again.

The testimony defendant attempted to elicit clearly constituted hearsay. Hearsay, as stated in *Evid.R.* 63, is "[e]vidence of a statement offered to prove the truth of the matter stated which is made other than by a witness while testifying at the hearing is hearsay evidence and is inadmissible except as provided in Rules 63(1) through 63(33)." There is no *R.* 63(1) through (33) exception here.

## POINT IV

Defendant asserts that the trial court erred in failing to grant defendant's motion for acquittal on counts three and four charging first degree aggravated sexual assault, contrary to *N.J.S.A.* 2C:14-2a. The trial judge, when reviewing the evidence upon a motion to acquit, must determine the following:

[W]hether the evidence at that point [conclusion of prosecution's evidence] is sufficient to warrant a conviction of the charge involved. *R.R.* 3:7-6. More specifically, the question the trial judge must determine is whether, viewing the state's evidence in its entirety, be that evidence direct or circumstantial, and giving the state the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

[*State v. Foreshaw*, 245 *N.J.Super.* 166, 185, 584 *A.2d* 832 (App.Div.1991), *certif. denied*, 126 *N.J.* 327, 598 *A.2d* 886 (1991) (citations omitted).]

When reviewing a judge's denial of a motion to acquit, we will apply an identical standard. *State v. Moffa*, 42 *N.J.* 258, 263, 200 *A.*2d 108 (1964). Further, when the motion is made at the conclusion of the State's case, the court is not to review the evidence presented by defendant. *State v. Reyes*, 50 *N.J.* 454, 459, 236 *A.*2d 385.

Defendant in the instant action was found guilty of aggravated sexual assault by cunnilingus (count three) and guilty of aggravated sexual assault by fellatio (count four). Defendant asserts the judge erred in not acquitting defendant on these counts because the State did not prove penetration beyond a reasonable doubt. The statute proscribing that behavior states:

An actor is guilty of aggravated sexual assault if he commits an act of sexual penetration with another person under any one of the following circumstances: (1) The victim is less than 13 years old.

[*N.J.S.A.* 2C:14–2(a)1.]

The statute defines sexual penetration as:

Sexual penetration means vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger, or object into the anus or vagina either by the actor or upon the actor's instruction. The depth of insertion shall not be relevant as to the question of commission of the crime....

[*N.J.S.A.* 2C:14–1.]

Initially, it must be noted that this court has determined sexual penetration does not require insertion into the vagina. *State v. Fraction*, 206 *N.J.Super.* 532, 536, 503 *A.*2d 336 (App.Div.1985), *certif. denied*, 104 *N.J.* 434, 517 *A.*2d 426 (1986). *See also State v. Ramos*, 226 *N.J.Super.* 339, 342, 544 *A.*2d 408 (App.Div.1988). The act of cunnilingus is " 'oral stimulation of the vulva or clitoris' ". *State v. Fraction, supra,* 206 *N.J.Super.* at 535, 503 *A.*2d 336 (citations omitted). The court determined that, "[t]hus, by definition cunnilingus constitutes a form of 'sexual penetration' under the statute notwithstanding the fact that the actor's tongue is not inserted in the vagina." *Id.* at 535–36, 503 *A.*2d 336.

According to this definition, it is clear that there existed enough evidence in the record for the jury to determine that "sexual

penetration" occurred. A.P. testified that defendant felt her "privacy" with his hand and his tongue. Detective Johnson testified that the victim informed her that defendant touched her genitals with his mouth and his hands. And finally, the victim herself testified defendant inserted his finger "a little" in her "privacy." This testimony, granting the State any reasonable inferences, constitutes enough evidence to find that defendant, beyond a reasonable doubt, penetrated the victim at the very least by committing cunnilingus.

There was also enough evidence to indicate that defendant engaged in fellatio with the victim. Fellatio is "the practice of obtaining sexual satisfaction by oral stimulation of the penis." *Webster's New International World Dictionary* 836 (3d ed. 1981). A.P. recounted to witnesses that defendant "tried to put his privacy in her mouth" and when she resisted, defendant held her nose to force her mouth open. She further said that he "peed in her face" describing the "pee" as white in color. At trial, with knowledge gained at school after the fact, she identified the "pee" as sperm. Thus, a jury could also have concluded that defendant committed aggravated sexual assault by fellatio.

## POINT V

Defendant asserts that the court erred in allowing the experts, Deborah Maasi, Dr. Julie Ashton, and Dr. Susan Cohen–Esquilian to testify to an ultimate issue in the case. We turn first to the contested testimony of Deborah Maasi, a social worker for the Division of Youth and Family Services. Defendant asserts that the following testimony was inadmissible:

Q. Was it your function to determine whether or not child abuse and neglect occurred?

A. Yes. Part of that function is in the assessment process to determine what services are necessary for the family involved.

This testimony is neutral. She did not testify that in her opinion, this particular child had been a victim of sexual abuse. *See State v. J.Q.*, 130 *N.J.* 554, 617 *A.2d* 1196 (1993).

Defendant also asserts that the following colloquy was inadmissible:

Q. And did she indicate to you whether or not she had told her parents of all these details?

A. Well, based on my interview of [A.P.] it was clear to me she had not told her parents everything that she had told me. When I asked her why, she indicated she was embarrassed. She was ashamed. She was ashamed about saying everything.

Q. Did it surprise you?.

A. No. I wasn't surprised because that's—it's not—

At this point, defense counsel objected and the objection was sustained. Thus, the State did not have a chance to elicit improper testimony if indeed such testimony would have been inadmissible. *See State v. J.Q., supra,* 130 *N.J.* at 579, 617 *A.2d* 1196, where expert explanation of the child abuse victim's behavior is allowed.

Defendant next argues that the court improperly admitted certain testimony of Dr. Cohen–Esquilian:

Q. What was your—without going into what he told you, what was your assessment of the situation at the time?

A. My assessment was that she may very well have communicated in a very typical four year old fashion, something we call egocentric, where they think they communicated or said something generally and it is not clear to adults what they're saying.

This testimony was properly admitted. Contrary to defendant's assertions, the doctor did not make an assessment or comment in any manner on whether this particular child had been abused.

■ Finally, the defense asserts that Dr. Ashton was also permitted to give testimony regarding the victim's sexual abuse. Dr. Ashton testified as follows without objection or motion to strike:

When I examined her on the physical exam she was completely within normal physical examination which wasn't surprising to me in light of her story. And in fact most cases that we see down there, obvious trauma from a recent abuse, many times you do not see physical findings at all which would be consistent, especially in light of her story. My feeling was at the time that since she told me the story unprovoked there was no reason for me to believe otherwise.

We note this testimony was not prompted by the prosecutor's question which asked, "and could you tell us what kind of conver-

sation you had with A.P.?" The testimony also was not strongly expressed and not phrased in terms of belief based upon expertise.

Subsequently, the doctor was asked to make an assessment regarding the possibility of child abuse in this case. The defense objected urging that the witness did not possess the requisite expertise to make that assessment. Over defense counsel's objection she testified as follows:

> My assessment was that although her physical findings were within normal limits, you know, it's impossible to say just based on physical findings, but in light of the history she gave me, I felt that she was a very articulate young girl and that could be very suggestive of possible sexual abuse.

The troublesome issue of experts testifying in infant sex abuse cases about the truthfulness of the infant victim's account of the incident was discussed by us in *State v. J.Q.*, 252 *N.J.Super.* 11, 599 *A.*2d 172 (App.Div.1991), *aff'd,* 130 *N.J.* 554, 617 *A.*2d 1196 (1993).[1] In *J.Q.*, a psychologist at trial was permitted to testify that she believed the stories of the victims and her reasons for that belief, all couched in terms of her "expertise" to recognize the truthfulness in child sex abuse cases. We held:

> There is no basis in our law for the expression of an expert opinion as to the truthfulness of a statement by another witness. Such a statement does not fall within any of the methods provided in the Rules of Evidence for supporting the credibility of a witness. Such testimony is quite distinct from character evidence relating to the traits of honesty and veracity which is permissible under *Evid.R.* 22. On the contrary, in this case, the character of the child witnesses for truthfulness was never addressed by the expert. What was said was that the expert believed that particular statements of the witnesses were true. Our rules do not allow such bolstering.
>
> . . . .
>
> By far the most dangerous aspect of opinion testimony as to whether a witness is telling the truth is that it is scientifically unreliable. There is simply no scientific foundation for an expert's evaluation of the credibility of a witness or for the conclusion that a psychologist or other social scientist has some particular ability to ferret out truthful from deceitful testimony. Absent a question of capacity, an expert is no better qualified than a lay person to assess the credibility of a witness.
>
> [*Id.* at 39–40, 599 *A.*2d 172. (Citations omitted).]

---

[1] This case was concluded in March 1991, without the benefit of our decision in *J.Q.*, decided November 14, 1991, or the Supreme Court's affirmance reached on January 6, 1993.

In *J.Q.*, we determined that admission of the witness's testimony warranted a reversal because the expert's opinion, indicating that the children had been abused was not supported by a reasonable basis and the opinion testimony was entirely based on scientifically unreliable "syndrome evidence". *Id.* at 42, 599 *A.*2d 172. Most importantly, we found that this testimony "could have tipped the balance" because it was influential and carried a potential to allow the jury to reach a decision they otherwise would not have reached. *Ibid.* Our decision not to allow "expert" testimony on the issue of a victim's truthfulness was affirmed by the Supreme Court. This aspect of affirmance was essentially for the reason that as yet, there is no accepted scientifically reliable method for determining truthfulness. *State v. J.Q., supra,* 130 *N.J.* at 577–83, 617 *A.*2d 1196.

However, the present case is not wholly analogous to *J.Q.,* While Dr. Ashton is a pediatrician, her testimony, couched in terms of possibility, did not rise to the level of expert testimony. If this had been a traditional medical issue setting, her statement, phrased as it was, would not have been competent to establish medical probability, the standard necessary to establish injury or causation. Further, Dr. Ashton's testimony did not vouch for the victim's truthfulness based upon an alleged theory of scientific reliability. In *J.Q.,* the expert specializing in child sex abuse cases was the primary witness in support of the State's case. Moreover, the *J.Q.* psychologist based her opinion of the infant's credibility and victimization, on an alleged scientific theory of soundness and reliability, namely the Child Sexual Abuse Syndrome. Clearly, the testimony we are reviewing in the instant case did not carry the same impact as the psychologist's in *J.Q.*

Nevertheless, even if Dr. Ashton's testimony did not reach the level of expert expression, it did carry the possibility of prejudice in a child sexual abuse trial. We certainly do not endorse a testimonial scenario which permits the State to produce witnesses to testify as to the truthfulness of the State's own witnesses.

However with this much acknowledged, we hasten to point out that in this case, the victim herself, age eleven by the time of trial, graphically testified about the event. The jury, therefore, had the ability to independently assess her credibility. In addition, there were several other corroboration witnesses all of whom testified to factually consistent accounts of the event obtained from the victim in close proximity to the acts complained of. Nor did Dr. Ashton vouch for the child's truthfulness on any theory of alleged scientific reliability. In this setting, the questionable three lines of testimony by Dr. Ashton, given amongst the total mix of three days of trial, did not carry the same potential for tipping the scale in favor of defendant's guilt as did the testimony in *J.Q.* It did not, in our view, create a reasonable doubt that defendant was denied a fair trial. *State v. Macon,* 57 *N.J.* 325, 338, 273 *A.*2d 1 (1971). Thus, we find the effect of this limited testimony to be harmless.

## POINT VI

Defendant next contends that comments made by the prosecutor during summation require reversal.

Initially, it should be noted that:

> The prosecutor is entitled to sum up the State's case graphically and forcefully. It is unreasonable to expect that criminal trials will be conducted without some show of feeling. Defense counsel traditionally make dramatic appeals to the emotions of the jury. In these circumstances, a prosecutor cannot be expected to present the State's case in a manner appropriate to a lecture hall.
>
> [*State v. Johnson,* 31 *N.J.* 489, 510–11, 158 *A.*2d 11 (1960).]

In appropriate cases, however, the reviewing courts have not been reluctant to find reversible error as a result of prosecutorial misconduct. *State v. Pratt,* 226 *N.J.Super.* 307, 544 *A.*2d 392 (App.Div.1988), *certif. denied,* 114 *N.J.* 314, 554 *A.*2d 864 (1988) (citations omitted).

Defendant asserts the prosecutor impermissibly informed the jury that the evidence indicated defendant penetrated the victim. The prosecutor stated:

We know that he's also charged on April 23 date of cunnilingus and fellatio and the Judge will read the definitions for you and I'm pretty confident that she will tell you that the slightest penetration is enough and that just by using his tongue on her vagina that certainly is penetration, however slight and the fellatio goes for him to touch her mouth with his penis and that is penetration in itself—

Defendant objected and the judge stated that she would instruct the jury on the law. Defendant now argues that the evidence in the record would not allow the prosecutor to comment on penetration. To the contrary, there was evidence which would permit the prosecutor to infer that penetration had occurred. The victim testified that defendant had placed his tongue on her "privacy". She also testified that he inserted his finger in her "privacy a little", placed his "privacy" on her face and "peed" on her face allowing a portion of the discharge to flow into her mouth. Since counsel may comment on statements that constitute legitimate inferences in the record, it was entirely permissible for the prosecutor to comment on penetration. *State v. Perry*, 65 *N.J.* 45, 48, 319 *A*.2d 474 (1974). Defendant asserts that the prosecutor was incorrect as a matter of fact and law when she stated defendant penetrated the victim orally by touching. However, as noted above, we held in *State v. Fraction, supra*, 206 *N.J.Super.* at 536, 503 *A*.2d 336, that vaginal penetration is not required to prove penetration.

Defendant also asserts that the prosecutor improperly commented on the expert's credibility. The comments complained of were made in response to defendant's comments during his closing, which questioned their credibility. In closing, defendant's counsel asserted that "I submit, ladies and gentlemen when those people, the DYFS worker, Dr. Ashton, Dr. Esquilian when they interviewed her, it was very cursory pro forma kind of thing . . . did very little probing of what actually transpired." The defense continued; "[a]nd I submit they do come to you, the DYFS worker and Deborah Maasi, Julie Ashton and Dr. Esquilian, they do come to you with a certain level of bias, not a great degree. . . . But don't you think they really want to believe a young child." The prosecutor, in closing stated:

> Maybe I'm wrong because the people we brought to you, just the DYFS worker, the psychologist, the medical doctor combined at the time this happened are at least testifying now and even then have between 35 to 40 years combined experiences dealing with children and dealing with children who have possibly been sexually abused.
>
> . . . .
>
> The fact is that all the testimony showed you from those witnesses that they are very qualified to see these children and to assess them and treat them and I'll submit to you, ladies and gentlemen I mean defense made it sound like the only reason they're there is just to automatically believe a child. I mean, give these people a little bit more credence. These are business people, just like all of you. They've gone through their training or their education, what they needed to do. Those are not paid witnesses by the State. They were witnesses who just in the course of a type of incident like this saw this child. They have no reason to come in here and say to you, oh you know, there is just no question this happened. I mean there is no reason to believe that all the reports you hear about, some of which you'll see and all their testimony, you didn't hear one of them say, you know, when she told me [A.P.] was in bed sleeping or she told me this or that, I know it couldn't have happened. If those details had caused them to think this couldn't have happened or didn't happen, do you really think they would be saying that? They are fact witnesses period.

In so doing, the prosecutor was responding to defendant's attempt to discredit the credibility of these witnesses during defense counsel's comments in closing. Generally, remarks by a prosecutor, made in response to remarks by opposing counsel, are harmless. *State v. DiPaglia*, 64 *N.J.* 288, 297, 315 *A.*2d 385 (1974). *See also State v. Wilson*, 57 *N.J.* 39, 50, 269 *A.*2d 153 (1970). Thus, the comments made in response to an issue defendant addressed in closing were not improper.

██ Finally, the defense asserts that the State was permitted to argue in its closing that Deborah Maasi indicated that shame was not atypical for a victim of child abuse. Specifically, the prosecutor stated:

> [W]hy didn't you tell your parents that he did the other things? And she said because she was ashamed. And she even told you that was not at all unusual that children do that especially when they are telling their parents.

Defense counsel objected, the court, however, overruled the objection. During the course of Ms. Maasi's testimony, the prosecutor questioned the witness regarding whether or not she was surprised by the fact the victim did not tell her parents all the facts regarding the incident and why the victim was ashamed about the

incident. When defense counsel objected, the court sustained the objection stating that surprise was irrelevant. Thus, the prosecutor commented in summation on evidence not in the record.

 Prosecutorial misconduct will not be grounds for reversal of a criminal conviction unless the "conduct is so egregious that it deprived defendant of a fair trial." *State v. Ramseur,* 106 *N.J.* 123, 322, 524 *A.*2d 188 (1987) (citing *State v. Kelly,* 97 *N.J.* 178, 218, 478 *A.*2d 364 (1984)). The *Ramseur* Court further explained that to determine whether a particular comment is prejudicial, the court must appraise whether defendant's counsel made a timely objection, whether the comment was withdrawn quickly, and whether the court ordered the comment stricken from the record. *State v. Ramseur, supra,* 106 *N.J.* at 322–33, 524 *A.*2d 188 (1987).

Although the prosecutor made a comment regarding testimony the court had not allowed into evidence at trial, the statement made in the course of the four day trial was not so egregious so as to deny defendant a fair trial.

## POINT VII

 Defendant also argues that the trial court erred in its charge to the jury. Specifically, the defense asserts that the court failed to instruct the jury on the definition of sexual assault.

 The judge, in charging the jury, must explain the controlling legal principles and the questions the jury must decide. *State v. Green,* 86 *N.J.* 281, 287, 430 *A.*2d 914 (1981). "[T]he test is to examine the charge in its entirety, to ascertain whether it is either ambiguous and misleading or fairly sets forth the controlling legal principles relevant to the facts of the case." *State v. LaBrutto,* 114 *N.J.* 187, 204, 553 *A.*2d 335 (1989) (citations omitted). A proper jury instruction on material points is pivotal, for without it, reversible error is presumed. *State v. Green, supra,* 86 *N.J.* at 288, 430 *A.*2d 914. Most importantly, "[i]n passing on the propriety of a trial court's charge, an appellate court reviews all that was said on the particular subject being challenged, *State v. Brown,* 46 *N.J.* 96, 101, 215 *A.*2d 9 (1965), and if on reading the

charge as a whole, 'prejudicial error does not appear then the verdict must stand.'" *State v. Ramseur, supra,* 106 *N.J.* at 280, 524 *A.*2d 188 (1987) (citations omitted).

The allegedly improper instruction centered around the judge's charge on the third and fourth counts of the indictment, aggravated sexual assault. The trial judge, in her charge to the jury, stated:

> The third and fourth counts are based upon New Jersey Statute 2C:14–2a(1), that provides in pertinent part, an actor is guilty of aggravated sexual assault if he commits an act of sexual penetration with another person where the victim is less than 13 years old.
>
> In order for you to find the defendant guilty of a crime, the State is required to prove, from all the evidence in the case, beyond a reasonable doubt each of the following elements:
>
> One, that on or about the specific day or days set forth in that particular count, the defendant engaged in sexual penetration with [A.P.]
>
> According to the law, sexual penetration means vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger or object into the anus or vagina. The slightest penetration is sufficient.
>
> The definition of cunnilingus is oral stimulation of the female sex organ.
>
> The definition of fellatio is oral stimulation of the male sex organ.

Defendant asserts that this charge was not supported by the evidence in that there was nothing in the record to indicate penetration had occurred. Defendant also contends that although testimony evidenced that digital penetration had occurred, defendant was not charged with this crime, thus the court should have omitted it from the jury charge to avoid confusing the jury.

Initially, it must be noted that this issue was not raised at the trial level, hence, it must be considered under the plain error standard. *R.* 2:10–2; *State v. Green, supra,* 86 *N.J.* at 289, 430 *A.*2d 914. We have previously determined that sexual penetration does not require insertion into the vagina. *State v. Fraction, supra,* 206 *N.J.Super.* at 536, 503 *A.*2d 336. In this case, there was evidence of penetration when A.P. testified that defendant felt her "privacy" with his hand and his tongue. A.P. testified that defendant tried to put his penis inside her mouth, and when she resisted, he held her nose to force her to open her mouth. She also testified that a substance entered her mouth, which she called

"pee" and identified as a white substance. Finally, she testified defendant had inserted his finger in her "privacy a little." Thus, there was enough evidence on the record to warrant such a charge. While the court did not omit digital penetration from its reading of *N.J.S.A.* 2C:14–2a(1), it did define fellatio and cunnilingus. It thus indicated that those were the only two charges of penetration to consider. We discern no error here.

Defendant also contends the court "misled the jury with its charge regarding expert testimony" in that the court did not explain whether Dr. Ashton and Dr. Cohen–Esquilian's testimony was based upon personal findings or evidence pursuant to *Evid.R.* 63(33). Defendant argues that the jury may have been misled to believe that these individuals were testifying as expert witnesses.

The judge could not be required, in the case at bar, to isolate each witnesses' testimony and inform the jury which witnesses were to be given weight as fact witnesses and which portions of the record were furnished as expert testimony. The court generally explained the weight the fact and expert's witnesses' testimony should be given. This was entirely sufficient to properly charge the jury. Thus, the jury instructions, taken as a whole, do not compel a reversal.

## POINT VIII

Finally, defendant contends the sentence received was manifestly excessive. He maintains that the mitigating factors outweighed the aggravating factors requiring the imposition of the minimum term of ten years. To reiterate defendant's sentence, the court imposed on counts three and four, charging him with aggravated sexual assault in the first degree, the presumptive term of fifteen years. With regard to count one, sexual assault in the second degree, defendant received a five year term. Finally, on count five of the indictment, aggravated sexual assault in the second degree, the court sentenced defendant to five years, the presumptive term being seven years. These terms are to run concurrently.

■ Guidelines for appellate review of sentencing decisions have been established by the Court in *State v. Roth*, 95 *N.J.* 334, 471 *A.*2d 370 (1984). In *Roth* the Court fashioned a tripartite analysis which directs an appellate court to "(a) review sentences to determine if legislative policies ... were violated; (b) review the aggravating and mitigating factors found below to determine whether those factors were based upon competent credible evidence in the record; and (c) determine whether, even though the court sentenced in accordance with the guidelines, nevertheless the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience." *Id.* at 364–65, 471 *A.*2d 370. The Court emphasized that the trial court must base its decision on "competent, reasonably credible evidence" and apply the appropriate legal principles. *Id.* at 363, 471 *A.*2d 370. If, however, the sentence is not properly based upon the evidence an appellate court may modify the sentence. *N.J.S.A.* 2C:44–7.

In the case at bar, the court determined that the aggravating factors outweighed any mitigating. The court determined that the following aggravating factors applied:

[Y]ou are aware that the acts in which you engaged certainly were particularly cruel and depraved as the prosecutor pointed out.

You know, you forced yourself upon an eight-year-old child and you forced her to perform oral sex. You urinated in her face. You fondled her vagina with your hand and your mouth and you engaged in various sexual acts which occurred, inserting your sexual parts into her sexual parts. She was eight years old and because of her age, its particularly serious and particularly grave to engage in those types of activities upon an individual who can't defend herself.

You were in a position of trust with her. She was like your uncle—you were like her uncle, so as to the offenses, I find that aggravating factor number one applies. I find that aggravating factor number two applies. I find that aggravating factor number four applies. And I find that aggravating factor number nine, the need for deterring yourself and others from engaging in similar activities, applies.

The court determined that the following mitigating factors were present:

I find, of course, that mitigating factor number seven applies in that you have no history of prior criminal activity, and that mitigating factor number eleven applies in that there will be harm suffered by your dependents here and the people who just came before me with children in their arms who related their sad stories of the

family members that are suffering as a result of this and will suffer certainly is recognized by the Court.

Defendant asserts that the court erred in utilizing the nature of the offense as an aggravating factor. More specifically, the defense alleges that the position of trust factor was an element of counts two and six. This argument is meritless since the court merged those counts and did not sentence defendant on counts two and six.

The court did, however, err in applying aggravating factor number two since the age of victim was an element of the offense itself. *State v. Hodge,* 207 *N.J.Super.* 363, 504 *A.*2d 679 (App.Div. 1986), *certif. denied,* 105 *N.J.* 518, 523 *A.*2d 163 (1986). It is well-settled that "[w]here an essential element of a crime is a specific fact, ... that element may not be used as an aggravating factor to impose a custodial sentence that is longer than the presumptive term or to impose a period of parole ineligibility." *State v. Link,* 197 *N.J.Super.* 615, 620, 485 *A.*2d 1069 (App.Div.1984), *certif. denied,* 101 *N.J.* 234, 501 *A.*2d 911 (1985). *See also State v. Towey,* 244 *N.J.Super.* 582, 583 *A.*2d 352 (App.Div.1990), *certif. denied,* 122 *N.J.* 159, 584 *A.*2d 226 (1990); *State v. Pineda,* 119 *N.J.* 621, 575 *A.*2d 855 (1990); *State v. Yarbough,* 195 *N.J.Super.* 135, 478 *A.*2d 432 (App.Div.1984), *remanded for resentencing on other grounds,* 100 *N.J.* 627, 645–46, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986).

Here, however, the judge did not apply a sentence beyond the presumptive term, therefore, error cannot be asserted. In counts three and four, the court applied the presumptive term of fifteen years. On counts one and five the court applied a term lower than the presumptive term of seven years by imposing only five years. We also note that the terms were to run concurrently. This was not a manifestly excessive verdict or one which would "represent a miscarriage of justice or shock the judicial conscience." *State v. Foreshaw,* 245 *N.J.Super., supra,* at 187, 584 *A.*2d 832 (citations omitted).

Even if aggravating factor number one (nature and circumstances of the offense) is also eliminated, the remaining two aggravating factors could outweigh the two mitigating factors. Aggravating and mitigating factors are not to be offset one to one, but each factor must be given the appropriate weight. *State v. Roth, supra,* 95 *N.J.* at 368, 471 *A.*2d 370.

We are satisfied that the sentence imposed here was neither excessive nor unduly punitive. Further, it did not represent a miscarriage of justice or shock our judicial conscience. *State v. O'Donnell,* 117 *N.J.* 210, 215–16, 564 *A.*2d 1202 (1989); *State v. Roth, supra,* 95 *N.J.* at 364–65, 471 *A.*2d 370.

Accordingly, the conviction and sentence are affirmed.