**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1279-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DONQUA THOMAS,

    Defendant-Appellant.

_____

> Argued January 27, 2026 – Decided March 11, 2026
>
> Before Judges Firko and Vinci.
>
> On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 21-05-0172.
>
> Ethan Kisch, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Ethan Kisch, of counsel and on the brief).
>
> Timothy P. Kerrigan Jr., Chief Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Leandra L. Cilindrello, of counsel and on the brief).

Appellant filed a supplemental brief on appellant's behalf.

PER CURIAM

Defendant Donqua Thomas appeals from a judgment of conviction entered on December 5, 2023, after he was convicted by a jury of first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2), and related weapons offenses. We affirm.

I.

The State alleges that on October 29, 2020, defendant shot Remy Lee four times in the parking lot of her apartment complex on Christina Place in Paterson. Lee was nine months pregnant with defendant's child. She died from her injuries, but her unborn child was delivered by emergency cesarean section and survived.

A Passaic County grand jury returned an indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1); and second-degree certain persons not to possess a firearm, N.J.S.A. 2C:39-7(b)(1).

We summarize the facts developed at defendant's seven-day trial in June 2023. Lee's mother, Charlene Keeling, testified that she was in Lee's apartment watching Lee's seven-year-old daughter while Lee went out for two routine

2

medical appointments when she heard gunshots. A neighbor came to the door and told her Lee had been shot. Keeling went outside and found Lee on the ground next to her car.

Keeling "grabbed [Lee's] hands, and . . . started asking her what happened, who did this? And [Lee] did[ not] say anything in the beginning. And [Keeling] kept . . . asking . . . who did this? And [Lee] said Qua." Keeling understood "Qua" referred to defendant. Keeling testified that Lee said "he[ is] in a red car or he ran to a red car," and then "she said Ma, Qua shot me. The last thing [Lee] said was, I can't breathe."

One of Lee's neighbors, Della McCall, who was chief of staff to the mayor of Paterson, testified she heard three gunshots that "were, kind of, one after another." She went outside and saw Lee on the ground. McCall called Paterson's director of public safety, Jerry Speziale, for help. Before Speziale arrived, McCall heard someone in the crowd ask Lee, "who did it?" and she "heard [Lee] say, Qua." McCall heard Lee say "Qua . . . that first time. And then [she] heard her say it again. And then she said it again."

McCall was with Lee for "[m]aybe, . . . five or six, seven minutes" before Speziale arrived. McCall testified that after Speziale arrived and began providing aid to Lee, she "kept saying, I do[ not] want to die, I do[ not] want to

die. And then she [asked] . . . Speziale, why did . . . he do this to me? . . . [W]hy would my baby father do this to me?"

Speziale testified that he received McCall's call at "about 1:38, 1:39" in the afternoon. "A few minutes" later, he arrived at the scene and observed Lee on the ground in the parking lot. Speziale "was holding her head and . . . telling [her] to please calm down." Lee said to him "two times she sa[id] I[ am] going to die, I can[not] breathe, I[ am] going to die, I can[not] breathe. Three times she sa[id] why did he do this to me, my baby father, why did he do this to me, my baby father."

Latressa Green, an off-duty law enforcement officer who lived on the same street, testified that she heard the gunshots and ran to her window. She "saw a lady screaming and falling, like dropping . . . in the parking lot in between the cars next to the sidewalk." She went outside and started providing aid to Lee. Green was asking Lee "who . . . shot her, did she see anything. And she . . . whisper[ed] like a name, and [Green] was[ not] sure what it was. . . . [Lee] said Qua, but [Green] was[ not] exactly sure what [she] was hearing because [she] was[ not] familiar with him. [She] did[ not] know the name, [she] was[ not] sure."

A-1279-23

Former Paterson Police Department (PPD) Detective John Scully testified that he responded to the scene of the shooting. He testified it was "raining very hard that day." He found two "9[-]millimeter shell casing[s]." One shell casing was on the sidewalk, and the other was "in the dirt . . . at the edge of the sidewalk." He also recovered three bullets at the scene. Police did not recover a firearm.

Gerald Burkhart, an expert in the field of firearms examination employed by the New Jersey State Police (NJSP), testified that the two shell casings were "discharged in one firearm to a practical degree of certainty." Additionally, "the three bullet specimens . . . were discharged from the same firearm to a practical degree of certainty." Burkhart testified that the shell casings were not "process[ed] for fingerprints or DNA" because the police "put in their note, no [latent] print or DNA search [wa]s needed."

PPD detective Brian Culmore responded to the scene and retrieved surveillance video from three cameras at the apartment complex that covered the area of the shooting.[1] At approximately 10:43 a.m. on October 29, 2020, a red Dodge Dart sedan with tinted windows parked in a parking spot in front of

---

[1] The surveillance video that was played for the jury is not included in the appellate record.

A-1279-23

Lee's apartment building, where it remained until Lee was shot. At 1:33 p.m., Lee arrived home in her car and backed into the parking space next to the Dodge Dart. After Lee exited her vehicle, she was between her car and the Dodge Dart and then fell to the ground. At 1:36 p.m., the Dodge Dart drove away from the scene.

PPD detective Jovan Candelo testified he located additional surveillance video from "throughout the city" that allowed him to track the movements of the Dodge Dart from Hamilton Avenue in Paterson to the scene of the shooting. On October 30, Detective Candelo interviewed Keeling and showed her the surveillance video he obtained of the Dodge Dart on Hamilton Avenue. Keeling identified the driver of the vehicle as defendant. Defendant was charged with murder and voluntarily surrendered the following day.

Detective Candelo was "able to get a partial plate" from the surveillance video and obtained "a list of Dodge Darts that were registered in the city with that partial plate." One of the vehicle owners identified on that list was Asasha Thomas, who lived on Hamilton Avenue. In November 2020, Detective Candelo contacted Thomas, who was on vacation in Florida, and she told him defendant, who is her cousin, "had possession of the vehicle" on October 29. Law enforcement was not immediately able to locate the vehicle. On December 12,

A-1279-23

the vehicle was located by the Wallington Police Department and towed to the PPD "hangar" where it was searched pursuant to a warrant.

Detective Candelo testified that PPD received multiple 911 calls following the shooting. At 1:54 p.m. on October 29, one caller stated they were on Katz Avenue and "saw someone with a yellow hoodie crawling out of the bushes and heading towards Redwood Avenue." PPD "did not follow up with that information" because the call "did[ not] corroborate with anything the witnesses said, any of the eyewitness statements [or] with any of the video surveillance that [they] received."

Asasha Thomas testified that defendant is her cousin and his nickname is "Qua." On October 29, 2020, she owned a 2013 red Dodge Dart with "really dark" tinted windows. In September 2020, she "swap[ped] cars" with defendant and allowed defendant to use the Dodge Dart. Thomas only had one set of keys to the vehicle, which she gave to defendant. Thomas testified that defendant was driving the Dodge Dart on October 29.

At that time, Thomas was living on Hamilton Avenue. On October 29, she was preparing "[t]o move [her] girlfriend back to Florida." Defendant helped them with the move. Thomas needed to rent a truck to make the trip. At

approximately 5:00 a.m., defendant arrived at her residence in the Dodge Dart and helped her move items into another vehicle.

Defendant parked the Dodge Dart in front of Thomas's residence on Hamilton Avenue and used the other vehicle to take her and her girlfriend to rent a truck. Defendant took them to "LaGuardia Airport first and then [they] came back over to either Clifton or Wayne . . . where [Thomas] got the rental from" around "9:30, 10:00 [a.m.]" Thomas and her girlfriend then left for Florida in the rental truck.

Jessica Otzhy, an investigator employed by the NJSP, testified as an expert in historical cell site analysis without objection. Otzhy prepared a report using GeoTime software to "analyze [historical cell site] data and represent it in a visual form" showing "what cell sites [defendant's] device connected to during a specified time period." In this case, the "call detail records" she used were provided by defendant's cell phone carrier, T-Mobile.

Otzhy testified she completed "multiple trainings" regarding historical cell site analysis including a "GeoTime level 1 training" course. Otzhy also completed other "more specialized" courses on "how records from one specific carrier differ from another," how to analyze "different types of data," and

8

A-1279-23

"GeoTime's level 2 training." Otzhy prepared more than 200 historical cell site analysis reports using GeoTime.

To prepare her report, Otzhy used the "industry average" for the coverage area of a cell site, which is "a mile and a half out from the antenna" because "that[ is] an average that has been set by the [F]BI" and "[t]hat[ is] the standard that [the NJSP] follow[ed] as well." She acknowledged that is "the average, but in some cases that might differ." "For example, if you[ are] in a city, you have a lot more people, who have a lot more demand for a connection to be made, so there[ is] going to be more cell sites available." In that case, "the individual coverage of some of those sites might be shorter since there[ are] more of them around."

The call detail records Otzhy used included all voice calls and text messages to and from defendant's cell phone. The records identified the "switch" or "cell site that handled the" calls and texts. The records also identified which "sector [of the cell site] handled the" call or text. The GeoTime software "will automatically map every event that has a location data within the call records."

Otzhy testified that on October 29, 2020, defendant's phone received an incoming call at 5:14 a.m. that connected to a cell site in Paterson, and another

A-1279-23

incoming call at 6:35 a.m. "that connected to a cell site in Manhattan." His phone then "ha[d] seven events that connected to a cell site which provided coverage to the homicide location between 11:05 a.m. and 12:15 p.m. that day." The "homicide location [was] well within th[e] mile and a half coverage" of that cell site. Otzhy testified she could have requested information "about the individual coverage of each cell site" from the carrier, but she did not have that information in this case because the carriers "do[ not] send that . . . with the call detail records."

Defendant did not testify. The sole defense witness was Carl Leisinger, III, who testified as a firearms expert. He opined that because "[t]he shells were [found] outside of" the vehicle, "the possibility of somebody shooting within the car was very remote, possibly not at all." His "synopsis of the scene [was] that the shooter was obviously outside their car." On cross-examination, he conceded that "the windows" of the Dodge Dart were "tinted" and he could not see if there was a person in the car "with a gun outside the window." He also conceded that whether the shell casings would have remained inside the car "depends [on] where [the shooter] had his hand."

On June 21, 2023, the jury found defendant guilty on all counts. After an appropriate merger, he was sentenced to life in prison subject to a thirty-year

period of parole ineligibility for first-degree murder, and concurrent sentences of ten years in prison for the weapons offenses. A conforming judgment of conviction was entered on December 5, 2023. This appeal followed.

## II.

On appeal, defendant raises the following points for our consideration.

POINT I

THE TRIAL COURT ERRED IN PERMITTING THE STATE TO INTRODUCE CUMULATIVE AND PREJUDICIAL DYING DECLARATION TESTIMONY.

. . . .

B. The dying declaration testimony was cumulative and resulted in undue prejudice.

POINT II

THE STATE'S EXPERT OFFERED INADMISSIBLE NET OPINION TESTIMONY CONCERNING THE LOCATION OF [DEFENDANT]'S CELL PHONE.

A. Expert testimony about cell phone location cannot be based on unverified distance estimates.

B. The State's expert used an unverified distance estimate to determine the range and coverage areas of cell towers, create coverage maps, and ultimately place [defendant] at the crime scene.

11

POINT III

THE STATE'S REPEATED MISCONDUCT DURING SUMMATION DEPRIVED [DEFENDANT] OF A FAIR TRIAL.

A. New Jersey courts hold prosecutors to a high bar–especially during summation.

B. The State testified about forensic facts not in evidence to fill a significant hole in its case.

C. The State shifted the burden of proof to [defendant] by incorrectly asserting that he controlled the evidence.

D. The State disparaged [defendant]'s prosaic third-party guilt defense as a "conspiracy" theory that there was another "man on a grassy knoll" who killed the victim.

E. Taken together, the State's repeated misconduct during summation deprived [defendant] of a fair trial.

POINT IV

THE TRIAL COURT FAILED TO PROVIDE PROPER JURY INSTRUCTIONS ON THREE CRUCIAL MATTERS.

. . . .

B. The trial court failed to instruct the jury on third-party guilt.

A-1279-23

C. The trial court failed to instruct the jury on how to assess . . . Lee's purported out-of-court identifications of [defendant].

D. The trial court failed to provide the jury tailored guidance on how to evaluate dying declarations.

POINT V

THE CUMULATIVE EFFECT OF THE TRIAL ERRORS DENIED [DEFENDANT] DUE PROCESS AND A FAIR TRIAL.

In a supplemental brief, defendant raises the following point for our consideration.

POINT I

TRIAL COURT ERRED TO ALLOW THE DYING DECLARATION IN TRIAL WHICH SHOULD HAVE BEEN RULED INADMISSIBLE

A. Dying [d]eclaration should have been inadmissible under N.J.R.E. 804(b)(2) because it was not made voluntarily but as a result of undue pressure.

B. Dying [d]eclaration should have been inadmissible under N.J.R.E. 403, because its probative value was substantially outweigh[ed] by undue prejudice.

C. Defendant incorporates herein . . . [the] brief, by trial counsel . . . dated July 7, 2022, in support of pre-trial motion to suppress the [d]ying [d]eclaration, with particular emphasis on sub point c [arguing admission of dying declaration testimony violates "defendant's

13

right to confront witnesses and his right to [d]ue [p]rocess of [l]aw and a [f]air [t]rial."]

### III.

Defendant contends the court erred by permitting the State to introduce testimony regarding Lee's dying declarations and that the testimony was cumulative and unduly prejudicial. We are unconvinced.

We defer to a trial court's evidentiary rulings unless the record reveals the trial court abused its discretion. State v. Garcia, 245 N.J. 412, 430 (2021). Deference is rooted in understanding that "the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins., 202 N.J. 369, 383-84 (2010)). Under this standard, to reverse a court's evidentiary ruling, the court "must be convinced that 'the trial court's ruling is so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting State v. J.A.C., 210 N.J. 281, 295 (2012)).

Pursuant to N.J.R.E. 804(b)(2), a dying declaration is not excluded by the hearsay rule. The Rule provides, "[i]n a criminal proceeding, a statement made by a victim unavailable as a witness is admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death." To satisfy the "belief of imminent death" requirement, the

proponent of a dying declaration must establish the declarant had "a settled hopeless expectation that death is near at hand, and what is said must have been spoken in the hush of its impending presence." State v. Williamson, 246 N.J. 185, 201 (2021) (quoting Shepard v. United States, 290 U.S. 96, 100 (1933)).

Of course, even if evidence could fall under an applicable exception, the court in its role as gatekeeper must "ensure that evidence admitted at trial is sufficiently reliable so that it may be of use to the finder of fact who will draw the ultimate conclusions of guilt or innocence." State v. Michaels, 136 N.J. 299, 316 (1994); see N.J.R.E. 403(a) (evidence "may be excluded if its probative value is substantially outweighed by the risk of . . . [u]ndue prejudice, confusion of issues, or misleading the jury").

Prior to trial, defendant moved to preclude the State from offering dying declaration testimony from Keeling and Speziale. On October 25, 2022, the court conducted a hearing pursuant to N.J.R.E. 104, at which Keeling and Speziale testified. On November 1, the court denied defendant's motion in an oral opinion.

The court found the witnesses credible and that the State met its burden to demonstrate the dying declaration testimony was admissible pursuant to N.J.R.E. 804(b)(2). The court found Lee's statements "were voluntarily made

and not the product of und[ue] pressure." The court also found the statements were made "in good faith while the victim declarant believed in the imminence [of death]." Specifically, Lee "was aware that she was shot and was having trouble breathing" and was "conscious, alert, and able to communicate when she made the statements." The court concluded, "based upon a totality of the relevant circumstances . . . the statements unquestionably satisf[ied] the elements of [N.J.R.E.] 804(b)(2)."

The court rejected defendant's confrontation clause argument based on our Supreme Court's decision in Williamson, "holding that dying declaration testimony . . . do[es] not violate the . . . Confrontation Clause of the U[nited] S[tates] Constitution or the New Jersey Constitution." The court also rejected defendant's argument based on N.J.R.E. 403 because "the probative value of the statements [was] not substantially outweighed by the risk of und[ue] prejudice, confusion of the issues, or misleading the jury."

During McCall's trial testimony on June 6, 2023, defendant objected to any additional dying declaration testimony because McCall did not testify at the pretrial hearing and "it[ was] cumulative." The court conducted a N.J.R.E. 104 hearing outside the presence of the jury, at which McCall testified. The court

16

found her testimony regarding Lee's statements met "all of the requirements of [a] dying declaration" and permitted "the State to elicit that testimony from her."

The court "counsel[ed] the State . . . three witnesses is giving the jury the benefit of all the information that they need on this particular point." The court added, "if there are four, five, or six witnesses that the State is going to attempt to elicit this information from then the defense's point that this is cumulative would have a lot more bearing on this [c]ourt's decision."

After a break in the proceedings, the State informed the court that "in light of [the court's] ruling[,] [the State] did get some clarification from . . . Green." Green "said [she] heard something and it did[ not] sound like a real name and then she said Quay." The State then advised the court when Green testified "it might take a delicate touch to make sure we do[ not] do anything that would constitute error."

Green testified several days later, on June 13. During her direct examination, she testified:

> [THE STATE:] [W]ere you talking to [Lee]?
>
> [GREEN:] Yes. I was asking her questions. I was asking her who . . . shot her, did she see anything. And she did . . . whisper like a name, and I was[ not] sure what it was. By that time . . . her mom had [come] outside and started to attend to her and she put her ear to her . . . face and then her mom repeated the name.

A-1279-23

[THE STATE:] So you did[ not] hear the victim say anything[?]

[GREEN:] . . . I did hear [her] say. . . . [S]he said Qua, but I was[ not] exactly sure what I was hearing because I was[ not] familiar with him. I did[ not] know the name, I was[ not] sure. And I asked again. And by that time her mother had come out and she spoke[] to her.

Defendant did not object to Green's trial testimony.

We are satisfied the court did not misapply its discretion by permitting Keeling, Speziale, and McCall to testify regarding Lee's dying declarations. There is no basis for us to disturb the court's determination that their testimony regarding Lee's dying declarations was admissible pursuant to N.J.R.E. 804(b)(2). The court's finding that Lee's statements were "made voluntarily and in good faith . . . while [she] believed in the imminence of [her] impending death" is amply supported by the record.

We are also persuaded the court properly applied N.J.R.E. 403 and determined the probative value of the testimony was not substantially outweighed by the risk of undue prejudice, confusing the issues, or misleading the jury. There is no reason for us to disturb the court's decision to admit the dying declaration testimony.

Because defendant did not object to Green's testimony, we review for plain error. Plain error is one "clearly capable of producing an unjust result."

18

State v. Singh, 245 N.J. 1, 13 (2021) (quoting R. 2:10-2). The "error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." Ibid. (quoting State v. R.K., 220 N.J. 444, 456 (2015)).

There is no basis to find plain error here. Green's testimony amounted to little more than a brief reference to her recollection that Lee said "Qua." The State did not elicit any other dying declaration testimony from Green beyond that single reference, which did not add anything the jury had not already heard from the other witnesses. Under the circumstances, we are satisfied Green's testimony was not "clearly capable of producing an unjust result." Id. at 13.

## IV.

Defendant contends the trial court erred in admitting inadmissible net opinion testimony concerning the location of his cell phone. Specifically, he argues Otzhy based her opinions on a one-and-a-half-mile industry average "set by the [F]BI" without "consider[ing] any facts or reliable data from which the actual range and coverage areas of the cell towers in Paterson could be calculated," resulting in a net opinion. We are not persuaded.

We review a trial court's determination that a witness is qualified to present expert testimony pursuant to N.J.R.E. 702 and review for abuse of

discretion.  <u>Garcia</u>, 245 N.J. at 430.  Such a determination "will only be reversed for manifest error and injustice."  <u>State v. Rosales</u>, 202 N.J. 549, 562-63 (2010) (quoting <u>State v. Jenewicz</u>, 193 N.J. 440, 455 (2008)).

N.J.R.E. 702 and N.J.R.E. 703 govern the admissibility of expert testimony.  <u>Townsend v. Pierre</u>, 221 N.J. 36, 53 (2015).

> Expert testimony must be offered by one who is "qualified as an expert by knowledge, skill, experience, training, or education" to offer a "scientific, technical, or . . . specialized" opinion that will assist the trier of fact, <u>see</u> N.J.R.E. 702, and the opinion must be based on facts or data of the type identified by and found acceptable under N.J.R.E. 703.
>
> [<u>Pomerantz Paper Corp. v. New Cmty. Corp.</u>, 207 N.J. 344, 372 (2011).]

"[A] court must ensure that the proffered expert does not offer a mere net opinion."  <u>Ibid.</u>  The net opinion rule, a corollary of N.J.R.E. 703, "forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data."  <u>Townsend</u>, 221 N.J. at 53-54 (quoting <u>Polzo v. County of Essex</u>, 196 N.J. 569, 583 (2008)).  "The rule requires that an expert 'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'"  <u>Id.</u> at 54 (quoting <u>Borough of Saddle River v. 66 E. Allendale, LLC</u>, 216 N.J. 115, 144 (2013)).

Defendant argues that Otzhy's expert testimony constituted improper "net opinion" under our Supreme Court's decision in State v. Burney, 255 N.J. 1 (2023), which was issued after this trial. In Burney, the Court noted that "[h]istorical cell-site analysis uses cell phone records and cell tower locations to determine, within some range of error, a cell phone's location at a particular time." 255 N.J. at 21 (quoting United States v. Hill, 818 F.3d 289, 295 (7th Cir. 2016)). "[C]ell site analysis simply confirms that the phone was somewhere within the coverage radius of the cell tower during the recorded activity." Id. at 22. "Across the nation, state and federal courts have accepted expert testimony about cell site analysis for the purpose of placing a cell phone within a 'general area' at a particular time." Id. at 21-22.

In Burney, an FBI agent serving as an expert for the State testified that cell towers in the area in question "had an approximate coverage range with a radius of about one mile" and "[t]hat estimated radius was based solely on [the special agent's] 'rule of thumb' for the area—a 'good approximation' based on his training and experience." Id. at 5. The agent "relied on that approximation to place defendant's cell phone at or near the crime scene at the time of the robbery" that the defendant was accused of committing. Ibid.

21

The Court concluded the agent's testimony was "an improper net opinion" "because the testimony was based on nothing more than [the agent's] personal experience. . . ." Id. at 25. It observed the agent had not substantiated that his one-mile-radius approximation of the cell tower range "is common practice in cell tower analysis, or that his one mile 'rule of thumb' had been used by any other agent or radio frequency engineer." Id. at 24. The Court further noted the agent "did not review the height of the [pertinent tower], did not review its rated power, did not calculate the estimated absorption of radio energy by nearby buildings or hills, did not review the specific angle of the tower's antenna, and did not review any diagnostic data from the tower" or "perform any tests of the [tower's] area of signal coverage." Id. at 24-25.

However, the Court did not suggest that, "to be admissible, expert testimony must consider all of the factors listed above." Id. at 25. At its core, Burney clarified that "our 'net opinion' doctrine under New Jersey evidence law weeds out experts who base their opinions on purely personal standards or 'rules of thumb.'" State v. Olenowski, 255 N.J. 529, 586 n.28 (2023).

In this case, unlike in Burney, the State's expert did not attest to any personal "rules of thumb." Instead, she based her opinions on the "industry average" that the coverage area of a cell site is "a mile and a half out from the

22

antenna" because "that[ is] an average that has been set by the [F]BI" and "that [ is] the standard that [the NJSP] follow[ed] as well." Thus, she established the average coverage area she used was "common practice in cell tower analysis" and "had been used by any other agent or radio frequency engineer" as required by Burney, 225 N.J. at 24.

In addition, Otzhy acknowledged that is "the average, but in some cases that might differ." She testified, "[f]or example, if you[ are] in a city, you have a lot more people, who have a lot more demand for a connection to be made, so there[ is] going to be more cell sites available." In that case, "the individual coverage of some of those sites might be shorter since there[ are] more of them around."

More importantly, contrary to defendant's argument, Otzhy did not testify that his phone was at the location of the shooting. Rather, she testified defendant's phone connected to a cell site in Paterson that was "well within" one and a half miles from the "homicide location" seven times between 11:05 a.m. and 12:15 p.m. on October 29, 2022. Effectively, she testified only that defendant's phone was in the general area of the shooting more than one hour before the shooting occurred. As the Court recognized in Burney, state and federal courts across the nation "have accepted expert testimony about cell site

23

analysis for the purpose of placing a cell phone within a 'general area' at a particular time." Id. at 21-22.

We are satisfied Otzhy's testimony was not net opinion and did not run afoul of our Supreme Court's decision in Burney. The court properly admitted her testimony and opinions.

Even if we were to find otherwise, defendant did not object to Otzhy's testimony and cannot establish plain error. The evidence of defendant's guilt independent of the historical cell site analysis is strong. Thomas's testimony established defendant was driving the Dodge Dart on the day of the shooting, surveillance video showed defendant driving the vehicle from Thomas's residence on Hamilton Avenue to the scene and showed the vehicle waiting at Lee's residence for over two hours then driving away after she was shot, and Lee's dying declarations identified defendant as the shooter. Given the abundance of incriminating evidence, the admission of any net opinion testimony from Otzhy was not "clearly capable of producing an unjust result." Singh, 245 N.J. at 13.

V.

We are unpersuaded by defendant's claims, raised for the first time on appeal, of prosecutorial misconduct during the State's summation. Specifically,

24

defendant argues the State: (1) improperly responded to defendant's argument that the State failed to test the shell casings for fingerprints or DNA by claiming such testing would have been futile without facts or evidence to support the claim; (2) shifted the burden of proof to defendant by asserting he controlled the evidence after the shooting; and (3) disparaged his third-party guilt defense.

When, as here, the defendant does not raise a timely objection, we review for plain error. R. 2:10-2. Generally, when the defendant fails to object to the prosecutor's comments at trial, the allegedly "improper remarks . . . will not be deemed prejudicial." State v. Timmendequas, 161 N.J. 515, 576 (1999), cert. denied, 534 U.S. 858 (2001).

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Williams, 471 N.J. Super. 34, 43 (App. Div. 2022) (quoting State v. Frost, 158 N.J. 76, 82 (1999)). "A prosecutor must 'conscientiously and ethically undertak[e] the difficult task of maintaining the precarious balance between promoting justice and achieving a conviction,' ensuring that at all times [their] 'remarks and actions [are] consistent with [their] duty to ensure that justice is achieved.'" State v. Jackson, 211 N.J. 394, 408 (2012) (first and third alterations in original) (quoting State v. Williams, 113 N.J. 393, 447-48 (1988)).

Prosecutors may "strike hard blows . . . [but not] foul ones."  State v. Wakefield, 190 N.J. 397, 436 (2007) (quotation omitted).  "Generally, remarks by a prosecutor, made in response to remarks by opposing counsel, are harmless."  State v. C.H., 264 N.J. Super. 112, 135 (App. Div. 1993).

Defendant's claim that the State shifted the burden of proof by arguing he controlled the evidence after the shooting lacks merit.  It was not improper for the prosecutor to highlight the State's contention that defendant was in control of the Dodge Dart, and any evidence contained in the vehicle, after the shooting. The State did not shift the burden of proof to defendant.

Nor was it improper for the State to respond to defendant's argument that there may have been a third-party shooter who crawled through the bushes by stating "[t]here[ was] . . . no one in the grassy knoll . . . you know, this is not a conspiracy."  The prosecutor was not "trivializing" or "disparaging" defendant's defense.  Rather, he was arguing that there was no evidence of a third-party shooter.

We are persuaded, however, that it was inappropriate for the prosecutor to imply to the jury fingerprint and DNA testing of the shell casings would have been futile.  Specifically, the prosecutor stated:

> [Defense counsel] also made mention of fingerprints or
> DNA analysis on the shell casing I showed you. Well

26

think about how the gun works. It[ is] an explosion out of a gun, it's hot. And to think where the shell casing was found and the conditions that were out there with a whole bunch of people outside, raining, what do you think you[ are] going to find on a shell casing? This is [ not] CSI.

"[R]eferences to matters extraneous to the evidence may constitute prosecutorial misconduct." State v. Williams, 244 N.J. 592, 607 (2021) (quoting Jackson, 211 N.J. at 408). Here, there was no evidence in the record, expert or otherwise, to support the prosecutor's implication that the shell casings could not have been tested for fingerprints or DNA evidence.

Nevertheless, a finding that a prosecutor has made an improper statement "does not end a reviewing court's inquiry; in order to merit reversal, the misconduct must have deprived the defendant of a fair trial." State v. Hawk, 327 N.J. Super. 276, 281 (App. Div. 2000). Such an error is not a basis for reversal unless the conduct was so egregious that it deprived the defendant of a fair trial. State v. DiFrisco, 137 N.J. 434, 474 (1994), cert. denied, 516 U.S. 1129 (1996). The prosecutor's conduct must have been so egregious that it "substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Timmendequas, 161 N.J. at 575. Overall, a court "must assess the prosecutor's comments in the context of the entire trial record," State v. Nelson, 173 N.J. 417, 472 (2002), including whether

the trial was lengthy, and the prosecutor's remarks were short or "errant." State v. Engel, 249 N.J. Super. 336, 382 (App. Div. 1991).

Considering this brief statement in light of the lengthy trial and the strength of the State's case, we are satisfied the prosecutor's comment did not deprive defendant of a fair trial. Indeed, the comment did not undermine defendant's argument that the State failed to offer any fingerprint or DNA evidence from the shell casings to link defendant to the shooting. As discussed previously, given that there was an abundance of incriminating evidence proving defendant was the shooter, the prosecutor's comment did not "substantially prejudice[] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Timmendequas, 161 N.J. at 575.

VI.

Defendant argues, for the first time on appeal, the court failed to: (1) instruct the jury on third-party guilt; (2) instruct the jury on how to assess Lee's dying declaration identification; and (3) provide "tailored guidance on how to evaluate dying declarations." These arguments are unpersuasive.

"An essential ingredient of a fair trial is that a jury receive adequate and understandable instructions." State v. Afanador, 151 N.J. 41, 54 (1997). "Correct jury instructions are 'at the heart of the proper execution of the jury

28

function in a criminal trial.'" Ibid. (quoting State v. Alexander, 136 N.J. 563, 571 (1994)). The trial judge must explain the law as it relates to the facts and issues of the case. State v. Baum, 224 N.J. 147, 159 (2016).

"It is the independent duty of the court to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party." State v. Reddish, 181 N.J. 553, 613 (2004). Indeed, every "request must concern legal and factual issues that have been properly raised in the proceedings." State v. Green, 86 N.J. 281, 290 (1981). Further, "[e]very request must state the correct principles of applicable law in a manner that is tailored to the facts of the case and is not misleading." Ibid. "The charge as a whole must be accurate." State v. Singleton, 211 N.J. 157, 182 (2012).

"The proper standards of review of jury instructions are well-settled: if the party contesting the instruction fails to object to it at trial, the standard on appeal is one of plain error; if the party objects, the review is for harmless error." State v. Cooper, 256 N.J. 593, 607 (2024) (quoting Willner v. Vertical Reality, Inc., 235 N.J. 65, 80 (2018)). Demonstrating plain error "is a 'high bar,' . . . requiring reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a

result it otherwise might not have reached.'" State v. Alessi, 240 N.J. 501, 527 (2020) (first quoting State v. Santamaria, 236 N.J. 390, 404 (2019); and then quoting State v. Macon, 57 N.J. 325, 336 (1971)).

"To determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)) (internal quotes omitted). "The 'high standard' used in plain error analysis 'provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error.'" State v. Burnham, 474 N.J. Super. 226, 230 (App. Div. 2022) (quoting Santamaria, 236 N.J. at 404).

Considered in light of the evidence produced at trial and the overall strength of the State's case, defendant's claim that the failure to provide the jury charge on third-party guilt, Model Jury Charges (Criminal), "Third Party Guilt Jury Charge" (approved Mar. 9, 2015), constituted plain error is not convincing. As discussed previously, there was overwhelming evidence that the shooter was in the Dodge Dart and defendant was the shooter. There is no basis for us to find a "reasonable doubt as to whether" the failure to provide the third-party

guilt charge "led the jury to a result it otherwise might not have reached."  Alessi, 240 N.J. at 527.

Defendant's claims that the court failed to instruct the jury on how to assess Lee's dying declarations and identification of defendant lack sufficient merit to warrant extended discussion in a written opinion.  R. 2:11-3(e)(2).  As defendant concedes, there is no applicable model jury charge and defendant did not request such a charge.  Moreover, it was not likely that Lee's identification of defendant as the shooter was based on a mistake.  Defendant was an intimate partner of Lee's and the father of her unborn child, and she identified him as the shooter at close range.  There is no basis for us to conclude the failure to give the model identification charge, Model Jury Charges (Criminal), "Identification: Out-of-Court Identification Only" (effective Sept. 4, 2012), could have "led the jury to a result it otherwise might not have reached."  Alessi, 240 N.J. at 527.

## VII.

We are unpersuaded by defendant's claim that he is entitled to a new trial based on cumulative error.  "A defendant is entitled to a fair trial but not a perfect one."  State v. Weaver, 219 N.J. 131, 155 (2014) (quoting Wakefield, 190 N.J. at 537).  However, "[w]hen legal errors cumulatively render a trial unfair, the Constitution requires a new trial."  Ibid.

A-1279-23

The State's case was strong, and to the extent there were errors made during the lengthy trial, they did not deprive defendant of his right to a fair trial. Based on our review of the trial record on the whole, we are satisfied there is no basis to reverse defendant's conviction based on cumulative error.

To the extent we have not considered any of defendant's remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division